BREMERTON SUN PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4673-62. Filed July 16, 1965.

*Jack M. Harrison,* for the petitioner.
*Paul G. Wilson,* for the respondent.

FAY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the taxable years 1958 and 1959 in the amounts of $21,324.54 and $19,628.26, respectively. The only issue for decision is whether petitioner is subject to tax under section 531 [1] with respect to all or any part of the earnings retained by it during the years involved herein.

### FINDINGS OF FACT

Petitioner is a corporation with principal place of business and office located at 306 Scripps Building, San Diego, Calif. It filed its Federal income tax returns for the years in issue with the district director of internal revenue, Los Angeles, Calif. It maintains its books of account and files its income tax returns on an accrual basis of accounting.

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

One hundred percent of the capital stock of petitioner, during the years in issue, was owned by John P. Scripps (hereinafter referred to as Scripps).

Petitioner came into existence under the laws of the State of Washington on July 8, 1935, for the primary purpose of publishing and distributing newspapers. Petitioner published its first newspaper, the Bremerton Sun, on July 15, 1935, in a space of 30 by 100 feet at 530 Fourth Street, in the city of Bremerton, Wash. This location was almost directly across the street from the building occupied by the family-owned competitor, W. B. Jessup & Sons, Inc., publishing the daily newspaper known as the Daily News-Searchlight, which had been in sole command of the newspaper field since 1900.

Petitioner was capitalized at $40,000. The sum of $10,000 was from the sale of stock, and the sum of $30,000 from paid-in capital.

From the date of its incorporation in 1935 until the beginning of 1941, petitioner operated at a steady loss, up to $4,000 per month in its worst times. Petitioner met these losses by borrowing money.

In the winter of 1939 the Bremerton Sun drew even with the Daily News-Searchlight in ad volume and had a lead in circulation.

In 1940 petitioner's landlord offered to erect a larger building to petitioner's specifications a few doors west on Fourth Street. His offer and suggestion were accepted and construction was begun in the spring of 1940 on a 60- by 90-foot building with a partial basement. The Bremerton Sun then announced that the new building was to be erected and that it would acquire a second Goss Cox-O-Type flatbed press and double its operation; this would match the 16-page capacity of the Daily News-Searchlight's rotary press.

The balance sheet of petitioner as of May 31, 1940, was as follows:

ASSETS

| | | |
|---|---:|---:|
| Cash | | $691. 27 |
| Accounts receivable | | 9, 581. 83 |
| Machinery and equipment | $19, 758. 67 | |
| Less: Depreciation | 6, 350. 99 | |
| | | 13, 407. 68 |
| Less equipment sold: | | |
| Telegram-Tribune | $3, 658. 20 | |
| Provo Herald | 3, 000. 00 | 6, 658. 20 |
| | | 6, 749. 48 |
| Newsprint | | 608. 31 |
| Total assets | | 17, 630. 89 |

LIABILITIES AND NET WORTH

| | | |
|---|---|---|
| Accounts payable | | $3, 386. 40 |
| Notes payable: | | |
| Dallas Dispatch Co | $5, 000. 00 | |
| Telegram-Tribune Co | 35, 000. 00 | |
| Herald Corp | 35, 000. 00 | |
| Coeur d'Alene Press Co | 10, 000. 00 | |
| Scripps Newspapers, Inc | 15, 500. 00 | |
| | | 100, 500. 00 |
| Stock: | | |
| Common | 5, 000. 00 | |
| Preferred | 5, 000. 00 | |
| | | 10, 000. 00 |
| Paid-in capital | | 30, 000. 00 |
| Earned surplus (deficit) | | (126, 255. 51) |
| Total liabilities and net worth | | 17, 630. 89 |

In early 1940, a short time prior to his acquisition of petitioner's stock, Scripps was approached by petitioner's officers and stockholders to negotiate, on their behalf, with the Jessup family for a consolidation and merger of the two Bremerton daily newspapers. Scripps agreed to do what he could in the matter. In a short time Scripps was in Bremerton and soon thereafter had worked out an oral understanding with the Jessups how and when the merger and consolidation of the newspapers would be effected. All necessary written agreements were thereafter prepared and ready for signature by the interested parties. The effective date of the merger and consolidation was to be August 1, 1940. However, when the time came for executing these agreements, the Jessups did not show up at the appointed time and place and gave no explanation for not doing so.

On July 28, 1940, the issued and outstanding capital stock of petitioner was owned as follows:

| Stockholder | Number of shares | |
|---|---|---|
| | Common | Preferred |
| Telegram-Tribune Co | 196⅞ | 26¼ |
| Herald Corp | 196⅞ | 27¼ |
| Coeur d'Alene Press | 56⅝ | 7¾ |
| Julius Gius | 20 | 200 |
| A. F. Ottevaere | 20 | 200 |
| M. H. Voorhees | | 30 |
| S. S. Hahn | 10 | 10 |
| Totals | 500 | 500 |

Scripps, on July 29, 1940, acquired options to purchase within 3 years all of the petitioner's issued and outstanding stock. These options were exercised within this period and all of the issued and outstanding stock of petitioner was then owned by Scripps.

Scripps took over the general management of petitioner on July 29, 1940, and the year 1941 reflected petitioner's first year of profitable operation. In that year the profit was $3,497.02.

On April 25, 1945, the Jessup family sold to petitioner, for $130,000, their newspaper known as the Daily News-Searchlight, together with the subscription lists and goodwill, as well as the equipment and other personal property used in connection with the newspaper and job printing plant.

After its purchase of the newspaper and job printing plant, petitioner sought a new location with larger quarters. A doctor in Bremerton, Kenneth P. Jackson, offered to construct a building to lease if petitioner would enter into a 25-year lease. The offer was accepted and a lease for 25 years was entered into on August 6, 1945, to commence January 1, 1946. In December 1954 petitioner purchased from Jackson the building and the land upon which it was situated for $251,751.50.

Under date of January 11, 1955, the firm of Dunstan & Dodds, architects and engineers, was employed by petitioner to determine what could be done to enlarge the newspaper's plant. Initially thought was given to adding a second story to the existing building. However, this idea was abandoned. Petitioner then attempted to purchase the adjoining real property owned by an elderly widow, Bertha Warming. She informed petitioner that she wanted petitioner to have the property eventually, but she was not then ready to sell. She agreed, however, to give the petitioner a written option to purchase the property. This option was dated August 10, 1955, and was acquired by petitioner for the sum of $5,000. The option gave petitioner the right to buy the property for $80,000, plus costs of sale, upon owner's death, or, at her election, during her lifetime, upon 30 days' written notice of her desire to sell. Under date of August 12, 1958, the owner gave written notice of her desire to sell the property according to the terms of the option agreement. Shortly thereafter, the petitioner purchased the property for $80,277.60. Technical Service Co. of Denver, Colo., was engaged in October 1958 to furnish industrial engineering services to petitioner in connection with a proposed new plant for the Bremerton Sun. The services rendered by this firm consisted of engineering consultation, study drawings, department and equipment layouts, equipment specifications, and preliminary building designs for use by petitioner's local architects, Branch, Branch & Garrison. In 1958 a contracting firm in Bremerton, known as Commercial Builders, was given a contract to make the additions and alterations to the Bremerton Sun plant. In the year 1960 petitioner expended the sum of $388,305.85 in the construction, furnishing, and equipping of the new plant.

Petitioner's capital investments, beginning with the year 1940 and ending December 31, 1959, were as follows:

| Year | Description | Amount |
|---|---|---|
| 1940 | Equipment and improvements | $1,349.63 |
| 1941 | ----do | 2,806.08 |
| 1942 | ----do | 4,973.68 |
| 1943 | ----do | 717.52 |
| 1944 | ----do | 951.35 |
| 1945 | Purchase of Daily News-Searchlight | 132,121.23 |
| 1946 | Improvements to leased building | 28,545.97 |
| 1946 | Machinery and equipment | 17,900.88 |
| 1947 | ----do | 21,776.06 |
| 1948 | ----do | 21,430.11 |
| 1949 | ----do | 12,118.95 |
| 1950 | ----do | 20,680.88 |
| 1951 | ----do | 6,575.90 |
| 1952 | ----do | 3,530.10 |
| 1953 | ----do | 10,241.03 |
| 1954 | ----do | 4,873.51 |
| 1954 | Purchase of Jackson property | 251,751.50 |
| 1955 | Machinery and equipment | 9,982.98 |
| 1956 | ----do | 55,539.40 |
| 1957 | ----do | 7,850.50 |
| 1957 | Purchase of land of parking lot | 21,051.45 |
| 1958 | Machinery and equipment | 15,167.70 |
| 1958 | Purchase of Warming property | 80,277.60 |
| 1959 | Construction in progress | 44,699.53 |
| 1959 | Machinery and equipment | 22,423.30 |
| 1959 | Equipment in progress | 59,216.00 |
| Total | | 858,522.84 |

Since the Daily News-Searchlight suspended publication in 1945, the Bremerton Sun has been the only daily newspaper published in Bremerton, Wash. The city of Bremerton is located in Kitsap County. The two leading daily newspapers published in Seattle, Wash., in 1947 had a combined daily circulation of 19,794 in Kitsap County. By 1959, this circulation had decreased to 7,946. Petitioner has had some competition since its acquisition of the Daily News-Searchlight from these two newspapers published in Seattle. A number of persons commute to Seattle from Bremerton by ferryboat. Efforts are exerted on this category of persons to purchase "Seattle" newspapers. Quality and familiarity are the petitioner's only resources for dealing with this "commuter" competition.

A large segment of the Bremerton economy is dependent upon the continued operation of the U.S. Navy Yard facility located in Bremerton, as it is the only major industry in the town. Employment at the yard has been as high as 25,000 persons. However, it has declined steadily since the Korean war and now it employs about 8,000 persons.

A few years ago the Secretary of the Navy stated that facilities around the country were going to be cut back. Because of rumors that this yard may close, merchants have not modernized their stores (some store fronts are from 30 to 40 years old). Extra efforts were necessary to keep circulation of the paper up in view of the sharp decline in the Navy yard personnel.

The average daily paid circulation of the Bremerton Sun in 1944 and in each of the years 1950 through 1959 was as follows:

| Year | Average daily paid circulation |
|---|---|
| 1944 | 11, 007 |
| 1950 | 17, 481 |
| 1951 | 18, 981 |
| 1952 | 20, 209 |
| 1953 | 21, 034 |
| 1954 | 21, 080 |
| 1955 | 21, 417 |
| 1956 | 21, 332 |
| 1957 | 21, 403 |
| 1958 | 20, 998 |
| 1959 | 21, 287 |

Petitioner's 1945 net income after Federal income taxes as disclosed by its Federal income tax return filed for said year was $18,298.62.

The following schedule discloses for each of the years 1950 through 1959 petitioner's net income before Federal income taxes, its Federal income taxes, net income after taxes, dividend payments to its sole shareholder, and the percent of net income paid out as dividends.

| Year | Net income before Federal income taxes | Federal income taxes | Net income after taxes | Dividend payments | Percent of net income paid out as dividends |
|---|---|---|---|---|---|
| 1950 | $67, 361. 19 | $23, 541. 70 | $43, 819. 49 | 0 | 0 |
| 1951 | 119, 781. 07 | 54, 925. 82 | 64, 855. 25 | 0 | 0 |
| 1952 | 160, 525. 69 | 88, 609. 12 | 71, 916. 57 | 0 | 0 |
| 1953 | 165, 012. 92 | 94, 882. 55 | 70, 130. 37 | 0 | 0 |
| 1954 | 192, 079. 26 | 93, 479. 22 | 98, 600. 04 | $30, 000 | 30. 4 |
| 1955 | 202, 110. 43 | 98, 697. 22 | 103, 413. 21 | 30, 000 | 29. 0 |
| 1956 | 204, 853. 63 | 99, 201. 28 | 105, 652. 35 | 30, 000 | 28. 4 |
| 1957 | 204, 123. 66 | 99, 760. 30 | 104, 363. 36 | 30, 000 | 28. 7 |
| 1958 | 211, 384. 61 | 103, 364. 53 | 108, 020. 08 | 30, 000 | 27. 8 |
| 1959 | 200, 363. 01 | 96, 362. 52 | 104, 000. 49 | 30, 000 | 28. 8 |

Petitioner has paid dividends to its sole shareholder each year since 1954. One factor considered by the board of directors of petitioner in arriving at the amount of dividends to be paid was the need for expansion, improvement, and modernization of facilities. Another factor considered by the board of directors was the possible competition from the Seattle newspapers as well as the possibility that the Navy yard would be closed down. The impact the declaration of dividends may have on Scripps, the sole stockholder, has not been considered by petitioner in determining dividend amounts. Petitioner's vice president and treasurer worked together to determine the amount of the dividends.

Irve C. Boldman, vice president of petitioner, is Scripps' financial advisor, having acted in such capacity for the last 31 years. Scripps' income, including the dividends he received from petitioner, was not suffi-

cient to provide for his current living expenses during the years in issue. It was necessary for Scripps, during the years in issue, to sell some of his investments in order to pay his income taxes.

Scripps has been in the newspaper business for a long time. During this time, his activities in the newspaper field reflect constant growth and expansion. Scripps owned, during the years in issue, the percentage of capital stock as indicated below of the following corporations:

|  | Percent |
| --- | --- |
| Petitioner | 100 |
| John P. Scripps Newspapers | 60 |
| Telegram Tribune Co | 81 |
| Tulare Newspapers, Inc. | 80 |
| Redding Record, Inc. | 60 |
| Watsonville Newspapers, Inc. | 60 |

Petitioner's management consists of an executive committee composed of Scripps, sole stockholder and chairman of the board; Boldman, vice president and general counsel; and J. L. McNally, treasurer. The executive committee, occupying the same suite of offices, meets every day to discuss and conduct petitioner's business affairs. The executive committee has not recorded in the minutes or transcribed its business decision except where required by corporate law. The executive committee acts in an informal manner. When necessary, it is in a position to act fast. Although petitioner did not have any additional formal plans for expansion after 1960, the history of petitioner shows a constant growth by means of retained earnings.

As of December 31, 1959, there were in effect five profit-sharing and increment agreements which petitioner had entered into with its following employees:

| Employee | Date of birth |
| --- | --- |
| Harry Green, general business manager | Jan. 14, 1904 |
| Boldman, legal counsel and member of executive committee | Feb. 11, 1896 |
| McNally, treasurer and member of executive committee | Aug. 14, 1905 |
| A. F. Ottevaere, local business manager | July 8, 1910 |
| Julius Guis, editorial director | Dec. 31, 1911 |

An epitome of the terms of the agreement between petitioner and McNally is as follows:

*Profit-Sharing Agreement.*

(1) Petitioner obligates itself to pay a "bonus" to McNally equal to 5 percent of the net profits of the Bremerton Sun in excess of $27,000, plus 6 percent per annum on any new capital investment made by petitioner over and above the depreciation reserve accumulated since July 1, 1945.

(2) Net profits of the Bremerton Sun in substance are determined by subtracting from gross profits all expenses, such as rent, depreciation, taxes, wages, losses, etc., and all amounts disbursed for replacement of equipment and liquidation of petitioner's debts.

(3) Upon ascertaining the amount of the bonus and after withholding tax has been deducted, 75 percent of the remainder is paid to the employee on request; the other 25 percent is retained by petitioner for the employee until $22,500 has been accumulated. Thereafter, all of the bonus is paid to the employee on request.

(4) The retained amounts draw interest at the rate of 6 percent per annum and interest is paid to the employee annually.

(5) The agreement is terminable at the will of either party.

(6) Any amount retained by petitioner for an employee may be paid in a lump sum or in five equal annual installments, with interest at 6 percent per annum on the unpaid balance.

*Increment Agreement.*

(1) If at the date of termination of employment or the agreement the Bremerton Sun has increased in value over its value as of July 1, 1945, the employee shall receive credit for 5 percent of the increase; conversely, if the value during the same interval has decreased, 5 percent of the decrease shall be deducted from the balance due the employee under the profit-sharing agreement.

(2) The fixed assets used in the publication of the newspaper, including additional capital investment in excess of the accumulated depreciation reserve since July 1, 1945, and goodwill value shall be the only items considered in determining increase or decrease in value.

(3) The same factors existing as of July 1, 1945, shall be considered with the factors existing at the date of termination of the agreement (except where the beginning increment value is agreed upon), so that actual difference in value of the newspaper property is determined for settlement purposes.

(4) Disputes arising under the "increment" section are to be settled by arbitration.

The following data summarize variations in the profit-sharing agreements with respect to covered employees:

| Employee and age at Dec. 31, 1959 | Percent of net profits | Percent retained | Base amount accumulated | Beginning increment value | Percent of increase |
|---|---|---|---|---|---|
| Green (55) | 10 | [1] 75 | $45,000 | $450,000 | 10 |
| Boldman (63) | 5 over $27,000 | 25 | 22,500 | To be determined | 5 |
| McNally (54) | do | 25 | 22,500 | do | 5 |
| Gius (48) | 10 | None | [2] 10,000 | 250,000 | 10 |
| Ottevaere (49) | 10 | None | [2] 10,000 | 250,000 | 10 |

[1] Changed by oral agreement to 25% during the years in issue.
[2] Paid into petitioner as a deposit by employee upon entering into the profit-sharing agreement.

The avowed purpose of each of these agreements is to reward the employee for his services to petitioner.

In December 1953, petitioner's executive committee passed the following resolution:

RESOLVED that the Treasurer of this Corporation be, and he is hereby, authorized and directed to set up on the books of this Corporation a reserve account in the sum of $250,000.00 from the Corporation's earned surplus to provide for the Corporation's liability under said profit-sharing agreements.

On December 7, 1959, after giving additional consideration to the continued growth of petitioner and the company's increased liability under the profit-sharing plans, the executive committee passed the following resolution:

RESOLVED that the Treasurer of this Corporation be, and he is hereby, authorized and directed to increase the reserve account from $250,000.00 to $300,000.00 from the Corporation's earned surplus to provide for the Corporation's liability under its profit-sharing agreements.

The amount of the reserve set up on the books of account in anticipation of future liabilities arising under the increment agreements was determined by the executive committee in part as follows: Current profits were reviewed; historical growth of the Bremerton Sun, including the increase in circulation, was considered; and the fact that the newspaper had consistently produced substantial net earnings after taxes was a major factor.

From these data, and with an awareness that certain employees might be considering retirement in the next few years, amounts (the total of which equaled $300,000) were on two occasions set up on the books of account as reservations of earned surplus. The executive committee was of the opinion that the reserve was on the low side, but nevertheless reasonable.

Petitioner's books and records show the following liabilities under the aforementioned profit-sharing and increment agreements:

|  | As of Dec. 31, 1958 | As of Dec. 31, 1959 |
|---|---|---|
| Liability under profit-sharing agreements | $76,951.38 | $82,752.63 |
| Liability under increment agreements | 250,000.00 | 300,000.00 |
| Total | 326,951.38 | 382,752.63 |

Petitioner's liability under the profit-sharing agreements is subject to exact calculation as of any date and the amounts shown above are exact with respect to such liability. However, the determination of the exact liability under the increment agreements cannot be made prior to the termination of employment of all of the covered employees.

Telegram Tribune Co. (referred to earlier as a corporation in which Scripps has a controlling interest) retired an employee in 1962. Under a profit-sharing and increment agreement similar to those discussed above, this employee is being paid approximately $40,000 over a 5-year period.

Petitioner's balance sheets for the taxable years 1958 and 1959 disclose the following:

| | Year ended Dec. 31— | |
| Assets | 1958 | 1959 |
|---|---|---|
| Cash on hand and in bank | $233, 515. 45 | $181, 763. 97 |
| Accounts receivable (net) | 98, 938. 51 | 105, 998. 27 |
| Notes receivable | 50, 000. 00 | 50, 000. 00 |
| U.S. Government bonds | 214, 883. 79 | 214, 655. 51 |
| Inventories | 39, 147. 72 | 39, 606. 99 |
| Depreciable assets (net) | 348, 774. 50 | 349, 010. 38 |
| Land | 96, 890. 41 | 96, 890. 41 |
| Construction in process | ------------ | 103, 967. 23 |
| Investments | 126, 619. 80 | 126, 619. 80 |
| Prepaid expenses | 2, 579. 49 | 2, 716. 66 |
| Goodwill (purchased) | 51, 805. 95 | 51, 805. 95 |
| Total assets | 1, 263, 155. 62 | 1, 323, 035. 17 |
| *Liabilities and net worth* | | |
| Accounts payable—current | 16, 743. 51 | 10, 061. 46 |
| Accrued taxes | 122, 222. 58 | 126, 303. 40 |
| Bond account | 9, 465. 43 | 175. 07 |
| Mortgage payable | 156, 998. 26 | 148, 839. 07 |
| Notes payable—employees' profit-sharing | 76, 951. 38 | 82, 752. 63 |
| Reserve for liability under employees' profit-sharing agreements | 250, 000. 00 | 300, 000. 00 |
| Reserve for purchase and improvement of real estate under option | 85, 000. 00 | ------------ |
| Deferred income | 3, 201. 90 | 3, 330. 49 |
| Capital stock | 10, 000. 00 | 10, 000. 00 |
| Earned surplus | 495, 914. 36 | 604, 914. 85 |
| Paid-in surplus | 36, 658. 20 | 36, 658. 20 |
| Total liabilities and net worth | 1, 263, 155. 62 | 1, 323, 035. 17 |

Accounts receivable of petitioner, consisting primarily of advertising accounts, turned over approximately 10 times per year.

The $50,000 note receivable appearing upon petitioner's balance sheets as of December 31, 1958, and December 31, 1959, represents a demand loan at 6-percent interest, made to Telegram Tribune Co. This loan was repaid to petitioner in the early part of 1960. As stated earlier, during the years in issue Scripps owned 81 percent of the outstanding capital stock of Telegram Tribune Co. When funds are available in any of the corporations "owned" wholly or in part by Scripps and there exists a need for funds in another of the "owned" corporations, the funds are loaned to other "owned" corporations at 6 percent per annum interest, normally on a short-term basis. This arrangement is reciprocal among the corporations and avoids, where possible, the use of bank loans. These types of loans are never used

576

on a permanent basis. For long-term loans, resort is had to banks. Petitioner did not during the years in issue make any loans to Scripps.

An analysis of the account "U.S. Government Bonds" appearing on petitioner's balance sheets as of December 31, 1958 and 1959, is as follows:

| Treasury bonds | Par value | Cost Dec. 31, 1958 | Cost Dec. 31, 1959 | Market value May 11, 1960 |
|---|---|---|---|---|
| 2½s 1964–69 | $70,000 | $70,599.78 | $70,524.83 | 87$\frac{12}{32}$ |
| 2¼s 1959–62 | 75,000 | 74,524.12 | 74,472.66 | 96$\frac{6}{32}$ |
| 2½s 1967–72 | 50,000 | 49,759.89 | 49,703.02 | 85$\frac{23}{32}$ |
| 2½s 1961 Nov | 20,000 | 20,000.00 | 20,000.00 | 97$\frac{19}{32}$ |

The reduction in cost between December 31, 1958 and 1959, represents accrued interest as of the date of purchase which was not actually received until the following year.

The above bonds were acquired beginning around the time of the Korean conflict for two reasons: (1) It was patriotic to make such investments and (2) these bonds were readily convertible into cash, while at the same time providing a return, and the funds represented thereby were earmarked for future expansion and replacement.

During the period when equipment was scarce and could not be acquired at a reasonable cost, petitioner made the aforementioned investments, knowing replacement was necessary of outmoded equipment that had become worn during the war.

In 1958 and 1959, substantial amounts were expended on the purchase of new equipment and facilities. However, the bonds which were held for just that purpose were not disposed of as of December 31, 1959, because petitioner did not want to absorb a loss on their disposal.

These particular bonds were selling for approximately 85 to 87 cents on the dollar during the years before the Court. Thus, to avoid realization of a loss on their disposition, the bonds were used as collateral to secure loans at a bank, and recognition of a loss was consequently avoided.

An analysis of the account "Investments," appearing on petitioner's balance sheets as of December 31, 1958 and 1959, is as follows:

700 shares of 5% preferred stock of E. W. Scripps Co__ $70,319.80

563 shares of common stock of West Tacoma

Newsprint Co_____ 56,300.00

Total _____ 126,619.80

Petitioner entered into an agreement with Powell River Co. whereby the latter was to supply newsprint to petitioner. Under the terms of the agreement, petitioner was obligated to purchase its entire need for newsprint from Powell River Co. However- because of a short-

age of newsprint, Powell River Co. informed petitioner that it should make efforts to find another supplier, as it could not supply all of petitioner's needs.

To cope with this problem, a group of publishers organized West Tacoma Newsprint Co. for the purpose of reactivating a mill. This was a cooperatively owned corporation in which stock ownership had to be offered to other shareholders before sale to outsiders was permitted.

In 1951 petitioner purchased sufficient stock ($56,300) to enable it to purchase up to 375 tons of newsprint per year. The price petitioner paid West Tacoma Newsprint for this newsprint was generally about $10 per ton below that purchased under contract. Petitioner did not purchase this stock as an investment.

Under profit-sharing plans between petitioner and its key employees discussed *supra*, and with each employee's consent, petitioner has retained each year a portion of profits due the employees, paying each employee interest at the rate of 6 percent per annum on the amount retained. Each employee reported his share of the profits as additional compensation for that year, even though such profits were retained by petitioner. The primary purpose of the retention of such funds was to provide the employee with security upon retirement.

To compensate for the 6-percent interest the petitioner was paying these employees, it invested a portion of the retained funds in E. W. Scripps Co. preferred stock. This stock was known to have a ready market and provided a fair return on the investment. Petitioner did not have any investments in unrelated businesses.

The account "Bond Account," appearing on petitioner's balance sheets as of December 31, 1958 and 1959, is analyzed as follows: Of the balance of $9,465.43 as of December 31, 1958, $9,297.93 represented savings of newspaper boys required under the terms of their route leases. They were required to accumulate a balance equal to 1 month's billing for their papers and the accounts served as a security for payment of their bills. Petitioner paid interest at the rate of 4 percent per annum on these deposits. Early in 1959, the security requirement was eliminated from the leases and all funds held were paid to the carriers. The balance of the account, $167.50 as of December 31, 1958, and $175.07 as of December 31, 1959, represented funds deducted from employees' wages under a payroll deduction plan for purchase of U.S. savings bonds. Bonds were purchased monthly as accumulations in an employee's account equaled the purchase price of a bond.

The account "Accrued Taxes" appearing on petitioner's balance sheets for the years in issue consists of Federal income taxes accrued

on prior years' profits, accrued payroll taxes, and Federal taxes withheld from employees' wages but not paid over at the end of the year. All amounts in the account were payable within 12 months and are classified as current liabilities.

An analysis of the account "Mortgage Payable," appearing upon petitioner's balance sheets as of December 31, 1958 and 1959, is as follows:

| | As of Dec. 31, 1958 | As of Dec. 31, 1959 |
|---|---|---|
| Note dated Sept. 2, 1958, in the principal sum of $55,000, payable to Theodore C. Blomberg, guardian of the Estate of Bertha Warming, an incompetent person, in monthly installments of $610.63, including 6% interest per annum from Sept. 10, 1958, commencing Oct. 10, 1958, secured by mortgage covering the real property purchased from the said Bertha Warming, in the city of Bremerton, county of Kitsap, State of Washington | $53,988.07 | $49,785.48 |
| Note dated Dec. 20, 1954, in the principal sum of $116,668.06, payable to Kenneth P. and Marguerite G. Jackson, in monthly installments of $835.80, including 6% interest per annum from Dec. 20, 1954, commencing Feb. 1, 1955, secured by mortgage covering real property purchased from the said Kenneth P. and Marguerite G. Jackson, in the city of Bremerton, county of Kitsap, State of Washington | 103,010.19 | 99,053.59 |
| Totals | 156,998.26 | 148,839.07 |
| Total payments due under said notes within 12 months of balance sheets' dates | 17,357.16 | 17,357.16 |
| Balance | 139,641.10 | 131,481.91 |
| Totals | 156,998.26 | 148,839.07 |

The note payable to Theodore C. Blomberg, guardian of the estate of Bertha Warming, an incompetent person, was paid in full on October 3, 1962. The note payable to Kenneth P. and Marguerite G. Jackson was paid in full on February 10, 1960.

Based on the foregoing classifications, the net working capital for the years in issue is as follows:

| | Dec. 31, 1958 | Dec. 31, 1959 |
|---|---|---|
| **Current assets:** | | |
| Cash on hand and in bank | $233,515.45 | $181,763.97 |
| Accounts receivable (net) | 98,938.51 | 105,998.27 |
| Notes receivable | 50,000.00 | 50,000.00 |
| U.S. Government bonds | 214,883.79 | 214,655.51 |
| Inventories | 39,147.72 | 39,606.99 |
| Prepaid expenses | 2,579.49 | 2,716.66 |
| Total current assets | 639,064.96 | 594,741.40 |
| **Less: Current liabilities:** | | |
| Accounts payable—current | 16,743.51 | 10,061.46 |
| Accrued taxes | 122,222.58 | 126,303.40 |
| Bond account | 9,465.43 | 175.07 |
| Mortgage payable (current portion) | 17,357.16 | 17,357.16 |
| Total current liabilities | 165,788.68 | 153,897.09 |
| Net working capital | 473,276.28 | 440,844.31 |

The ratio of current assets to current liabilities as of the two balance sheet dates is as follows: December 31, 1958, 3.85 to 1; December 31, 1959, 3.86 to 1.

Petitioner's operating expenses (excluding depreciation) required an outlay of funds in the years at issue, as follows: 1958, $927,966.28; 1959, $966,211.66.

The accumulated earnings of petitioner were as follows:

| Taxable year ended Dec. 31— | Accumulated earnings [1] |
|---|---|
| 1954 | $529, 465. 36 |
| 1957 | 667, 894. 28 |
| 1958 | 745, 914. 36 |
| 1959 | 904, 914. 85 |

[1] Included within this column is the reserve for liability under profit-sharing agreements.

Petitioner paid a salary of $12,000 to Scripps during each of the years 1958 and 1959.

Had petitioner distributed all of its accumulated taxable income for the taxable years 1957, 1958, and 1959, and had John P. Scripps Newspapers, a corporation in which Scripps owned 60 percent of the stock, distributed all of its accumulated taxable income for the taxable years 1957, 1958, and 1959, Scripps would have been required to pay the following additional Federal income taxes:

| Year | Amount |
|---|---|
| 1957 | $102, 393. 60 |
| 1958 | 108, 631. 26 |
| 1959 | 118, 443. 27 |

Scripps is a grandson of the late E. W. Scripps, and the E. W. Scripps Co. newspapers are operated in the East by cousins of Scripps. Except as stated, there is no other connection or relation between John P. Scripps Newspapers and E. W. Scripps Co.

Respondent, in accordance with section 534(b), sent petitioner notice that he intended to issue a deficiency notice for the years 1958 and 1959 based on section 531. Petitioner, in accordance with section 534(c), sent respondent a very detailed statement setting forth its grounds upon which it relies to establish that its retained earnings for the years in issue were not permitted to accumulate beyond the reasonable needs of its business.

The grounds relied upon by petitioner in its statement were as follows:

1. The accumulations of earnings and profits by petitioner during the calendar years 1958 and 1959 were necessary to provide for expansion of its plant and facilities.

2. The accumulations of earnings and profits by petitioner during the calendar years 1958 and 1959 were necessary to provide for reserves to meet competition.

3. The accumulations of earnings and profits by petitioner during the calendar years 1958 and 1959 were necessary to meet the deferred liabilities arising out of profit-sharing and increment agreements covering its key employees.

4. The accumulations of earnings and profits during the calendar years 1958 and 1959 were necessary to provide needed working capital.

5. The accumulations of earnings and profits during the calendar years 1958 and 1959 were necessary to provide a reserve for reverses in business.

6. No portion of the petitioner's earnings and profits has been loaned to or for the benefit of its shareholders.

7. No portion of petitioner's earnings and profits has been invested in a business unrelated to that of petitioner.

The statement sets forth facts sufficient except as to the second and fifth grounds to show the basis of the grounds relied upon.

OPINION

Respondent determined deficiencies in petitioner's income tax for the taxable years 1958 and 1959 under section 531 [2] in that petitioner was availed of for the purpose of avoiding the income tax with respect to its sole shareholder by permitting its earnings and profits to be accumulated instead of being distributed as a dividend.[3] Under the present statutory provisions dealing with the accumulated earnings tax, unless petitioner can prove to the contrary by a preponderance of the evidence, the very fact that its earnings and profits were permitted to accumulate beyond the reasonable needs of its business is determinative of the proscribed purpose.[4] However, to the extent petitioner can establish that it retained all or any part of its earnings and profits to meet the reasonable needs of its business, such amount will be allowed as a credit against its accumulated taxable income, subject to

---

[2] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

[3] SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

[4] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

the accumulated earnings tax.[5]  It thus becomes necessary to consider whether petitioner's earnings and profits were, during the years in issue, accumulated beyond the reasonable needs of its business.  Included within this question is the necessity of determining to what extent the earnings and profits were accumulated for the reasonable needs of the business so as to give proper consideration to the credit. *Motor Fuel Carriers, Inc.* v. *United States*, 323 F. 2d 576, 580 (C.A. 5, 1963).  Pursuant to section 537, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

In connection with its determination, respondent sent to petitioner a notice of his intention to issue a notice of deficiency imposing the accumulated earnings tax.[6]  In response to such notification, petitioner sent to respondent a statement setting forth the grounds upon which it relies to show that the accumulation of its earnings and profits was for the reasonable needs of its business.[7]

Respondent takes the position that the statement submitted by petitioner was too vague and too broad to place the burden of proof as to the reasonable needs of the business on respondent.  Petitioner, on

[5] SEC. 535. ACCUMULATED TAXABLE INCOME.

(a) DEFINITION.—For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)).

\*     \*     \*     \*     \*     \*     \*

(c) ACCUMULATED EARNINGS CREDIT.—

(1) GENERAL RULE.—For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year.

[6] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531.  In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before \* \* \* the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day.

[7] SEC. 534. BURDEN OF PROOF.

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

the other hand, maintains that the facts set forth in its statement are sufficiently clear, definite, and specific to place the burden of proof as to the reasonableness of the accumulation for the grounds stated on respondent. We partially agree with petitioner.

We have carefully read the statement submitted by petitioner, and after giving full consideration to the argument of respondent we are of the opinion that the statement, except as to the second and fifth grounds, "does suffice to meet the general purpose and intent of the statute, and thereby to shift the burden of proof to the respondent with respect to the grounds alleged therein." *Electric Regulator Corporation*, 40 T.C. 757, 764 (1963), reversed on other grounds 336 F. 2d 339 (C.A. 2, 1964); *Factories Investment Corporation*, 39 T.C. 908, 915 (1963), affd. 328 F. 2d 781 (C.A. 2, 1964). The allegations contained in the statement advance grounds, which, if true, would support a finding that the accumulation of petitioner's earnings and profits was for the reasonable needs of its business. See *John P. Scripps Newspapers*, 44 T.C. 453 (1965), and sec. 1.537-2 (b) and (c), Income Tax Regs.[8]

Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable needs and whether it was availed of for the purpose of avoiding the income tax with respect to its shareholders are both questions of fact. *Helvering* v. *Nat. Grocery Co.*, 304 U.S. 282 (1938); *James M. Pierce Corporation*, 38 T.C. 643 (1962), reversed on another issue 326 F. 2d 67 (C.A. 8, 1964). In determining whether petitioner's accumulations of earnings and profits during the years in issue were for the reasonable needs of its business, it becomes necessary to determine whether prior accumulations were, in fact, sufficient to meet petitioner's needs during the current years. Sec. 1.535-3(b)(1)(ii), Income Tax Regs. However, in making the comparison of prior accumulations and current retained earnings and profits with the reasonable needs of the business, it is necessary to determine the nature of the surplus. *John P. Scripps Newspapers*, *supra*. The mere size of the previously accumulated earnings and profits is not in and of itself indicative that they were sufficient to cover the future needs of the business. As was stated by the Court of Appeals for the Fourth Circuit in *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 500-501 (1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960):

the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the sur-

[8] We think the following quote from *Raymond I. Smith, Inc.* v. *Commissioner*, 292 F. 2d 470, 475-476 (C.A. 9, 1961), affirming 33 T.C. 141 (1959), certiorari denied 368 U.S. 948 (1961), is appropriate here: "Congress did not want the taxing authorities to be second-guessing the responsible managers of corporations as to whether and to what extent profits should be distributed or retained, unless they [taxing authorities] were in a position to prove that their position was correct. *Casey* v. *C.I.R.*, 2 Cir., 267 F. 2d 26, 30."

plus may be justifiably earmarked in the form of reserves, for specific necessary business needs.[3] Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * [Footnote omitted.]

It therefore follows that the utilization of working capital by a business for the purchase of fixed assets, although not an occasion for a charge against earned surplus in an accounting sense, does in fact decrease the amount of funds otherwise available for operating purposes. On the other hand, if the accumulation of surplus is reflected in liquid assets which are sufficient to meet the business needs for plant expansion, working capital, and other reasonable contingencies, this is a strong indication that the accumulation of surplus was beyond the reasonable needs of the business. *Smoot Sand & Gravel Corporation* v. *Commissioner*, *supra* at 501.

We therefore approach the examination of petitioner's prior accumulated surplus (Dec. 31, 1957) as well as its current retained earnings and profits with the foregoing principles in mind. In determining the reasonableness of petitioner's retained earnings during the years in issue, we must keep in mind also that the burden of proof with regard to the various grounds set forth in petitioner's statement, except as to the second and fifth grounds, is on the respondent. Petitioner's statement can be broken into two parts. The first part contains five grounds to show that the accumulation of earnings and profits was for the reasonable needs of the business. The second part contains two grounds showing why the accumulation was not beyond the reasonable needs of its business and that petitioner was not availed of for the proscribed purpose.

We have stated before that what the reasonable needs of a business are, is, at first instance, a question for the officers and directors of the corporation. *Crawford County Printing & Publishing Co.*, 17 T.C. 1404, 1414 (1952). A corporation can finance its growth by various means. One such method is the retention of its earnings and profits until such time as it is ready to expand. *Crawford County Printing & Publishing Co.*, *supra*. Courts should be hesitant to substitute their judgment and attribute a tax-avoidance motive unless the facts and circumstances clearly warrant the conclusion that the accumulation of earnings and profits was unreasonable and for the proscribed purpose. *Breitfeller Sales, Inc.*, 28 T.C. 1164, 1168 (1957).

Petitioner maintains, and we agree, that its officers and directors after considering the needs of the business for expansion, meeting competition, and reserves for contingent liabilities as well as possible business reverses, and working capital, decided to distribute a portion of its current earnings while retaining the remainder. "This decision by the directors of petitioner * * * reflects appropriate exercise of the

managerial function when measured by the standards of a prudent businessman." *John P. Scripps Newspapers, supra.* See also *J. L. Goodman Furniture Co.*, 11 T.C. 530, 536 (1948).

We have set forth the facts of this case with great detail and at length. An examination of those facts reveals that petitioner has not remained static but, on the contrary, has grown from a newspaper with a daily circulation of 11,007 in 1944 to 21,287 in 1959. Its net income after taxes has grown from $18,298.62 in 1945 to $104,000.49 in 1959. Petitioner has not allowed its earnings to be idle but, instead, has plowed back its earnings for the expansion and for the continued growth of its business. Petitioner's balance sheet as of December 31, 1940, reflects total assets of $17,630.89, while the total assets for December 31, 1959, are $1,323,035.17. Petitioner's balance sheet on December 31, 1940, reveals fixed assets of $6,749.48, while the same item on December 31, 1959, is $549,868.02. From 1940 through and including 1959, petitioner has invested $858,552.84 in additions to its property account, of which $221,784.13 was invested during the years in issue. The fact that this petitioner has financed its growth from retained earnings rather than from the sale of additional stock or commercial borrowing should not place it in a position of being subjected to a penalty tax under section 531. The record is replete with evidence indicating that petitioner's policy of continued growth and expansion has been followed without giving any thought whatsoever to the tax considerations of its shareholder. *Crawford County Printing & Publishing Co., supra.* In 1958, petitioner had definite and fixed plans for expansion, which plans were put into "production" and completed during 1961. Evidence of what petitioner did in later years does affect the weight to be given to the evidence of petitioner's intentions during the years in issue. *Dixie, Inc.*, 31 T.C. 415, 430 (1958), affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960); sec. 1.537–1(b)(2), Income Tax Regs. First, petitioner purchased a piece of land upon which it held an option. The cost of the property was $80,277.60. During the same year, 1958, petitioner employed the services of an engineering firm in connection with the building of a new plant for its newspaper. Shortly thereafter a contracting firm was hired to do the actual construction, and in 1960 petitioner paid $388,305.85 for the cost of constructing said new plant.

We realize that petitioner's directors act in a rather informal manner and that their plans for expansion might not be as specific as desired nor are all their plans reduced to writing and contained in formal minutes. However, the history of petitioner has been to act in an informal manner. The executive committee, which is the core of petitioner's management, meets daily and when necessary can act with deliberate speed. A closely held corporation cannot be held to the

same strict formalities of large public corporations. *Times Publishing Co.* v. *United States*, an unreported case (W.D. Pa. 1963, 11 A.F.T.R. 2d 1228, 63-1 U.S.T. C. par. 9325); *Duke Laboratories, Inc.* v. *United States*, 222 F. Supp. 400, 412 (D. Conn. 1963), affd. 337 F. 2d 280 (C.A. 2, 1964). We have found as a fact that petitioner did not have any formal plans for expansion subsequent to 1960. However, during the years in issue, petitioner did have definite and formal plans for expansion which were actually carried out and completed in 1960. As stated earlier, petitioner's entire history reflects a policy of constant growth. "It is not always possible for a company in advance to set aside a specific sum to achieve a specific goal." *John P. Scripps Newspapers, supra.* We are of the opinion that petitioner was justified upon the facts of this case in retaining some of its earnings during the years in issue for future expansion. *Gazette Pub. Co.* v. *Self*, 103 F. Supp. 779 (E.D. Ark. 1952); *Crawford County Printing & Publishing Co., supra; F. E. Watkins Motor Co.*, 31 T.C. 288 (1958).

In petitioner's statement, it is claimed that an accumulation of surplus was necessary to meet competition and possible business reverses. The statement itself on these two points is weak. For this reason, we have held that the burden of proof as to those two grounds is still on petitioner. We are satisfied from the evidence introduced at the trial of this case that petitioner, although publishing the only paper in Bremerton, did have some competition from the Seattle, Wash., daily newspapers. We are also satisfied that in view of the possible closing of the Navy yard in Bremerton, petitioner was justified in accumulating some of its earnings to meet any business loss resulting from the yard's closing. However, we are not convinced from the evidence presented that petitioner's surplus as of December 31, 1957, was not sufficient to meet these two needs. Accordingly, we hold that petitioner was not justified in retaining any additional earnings during the years in issue for these two purposes. *J. Gordon Turnbull, Inc.*, 41 T.C. 358, 371 (1963), on appeal (C.A. 6, Sept. 16, 1964).

Continuing with petitioner's statement, it is asserted that earnings were retained to meet the increasing contingent liability petitioner had under its profit-sharing and retirement plans. The details of said plans are set forth in our Findings of Fact. Suffice to say here that respondent's contention that because the liability was too remote and not capable of being calculated it could not justify the accumulation of surplus is rejected. The retirement portion of the plan provided for the covered employees to receive, upon their retirement, a certain percentage of the increased value of petitioner's assets (fixed assets and goodwill) from their value as of 1945 to the date of retirement. We have set forth in our Findings of Fact the financial growth of petitioner. Not only have its annual earnings grown but its total assets

have greatly increased. It is true, as respondent states, that future business reverses may reduce petitioner's liability under the retirement plans. However, in light of the history of petitioner we are in complete agreement with the directors' action of setting up a reserve to meet this contingent liability. Sound business judgment requires such action. The original reserve was $250,000 set up in 1953. However, in 1959, after examining the financial prospects of petitioner, it was decided by the directors that a reserve of $300,000 was more reasonable.

We agree that "a contingency is a reasonable need for which a business may provide, if the likelihood, not merely the remote possibility, of its occurrence reasonably appears to a prudent business firm." *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 206 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court, certiorari denied 354 U.S. 922 (1957). The liability under the facts in this case was contingent only as to the amount, not as to the actual liability. No management group would ignore the existence of such a liability, and the setting aside of a reserve out of accumulated surplus for such purpose was entirely proper. The growth of petitioner over the years clearly indicates the presence of goodwill, one of the measuring rods in determining the value of petitioner for purposes of the retirement plan. The goodwill, plus the increased investment in fixed assets, in our opinion, clearly justifies the reserve in the amount set aside. See *John P. Scripps Newspapers, supra; Lion Clothing Co.*, 8 T.C. 1181, 1189 (1947); *William C. Atwater & Co.*, 10 T.C. 218, 251 (1948).

Petitioner's last ground for the accumulation of its surplus is to provide funds for working capital. The retention of earnings to provide for working capital requirements has been held to be for the reasonable needs of a business. Sec. 1.537-2(b)(4), Income Tax Regs.; *J. L. Goodman Furniture Co., supra.* As an aid in determining whether a corporation's working capital requirements are sufficient to meet its needs, resort has been had to certain general "rules of thumb." It has been held that a ratio of current assets to current liabilities which is in the neighborhood of $2\frac{1}{2}$ to 1 is an indication of a reasonable accumulation of surplus. *John P. Scripps Newspapers, supra.* Cf. *R. C. Tway Coal Sales Co.* v. *United States*, 3 F. Supp. 668 (W.D. Ky. 1933), affd. 75 F. 2d 336 (C.A. 6, 1935); *Sandy Estate Co.*, 43 T.C. 361 (1964); *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803 (C.A. 5, 1963); *Breitfeller Sales, Inc., supra; James M. Pierce Corporation, supra.* The other rule of thumb sometimes resorted to states that an accumulation of earnings to meet operating expenses for at least 1 year is reasonable. *F. E. Watkins Motor Co., supra; J. L. Goodman Furniture Co., supra; James M. Pierce Corporation, supra.* However, it has been said that working capital require-

ments of one business are not necessarily the same as another business and that therefore the rule of thumb should not be given any greater weight than a rule of administrative convenience. *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960); *Barrow Manufacturing Company* v. *Commissioner*, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817 (1962). With the above general principles in mind, we will analyze petitioner's working capital requirements for the years in issue.

We have set forth in our Findings of Fact petitioner's balance sheets for the years in issue as well as its operating expenses. Respondent argues that petitioner's investments in preferred stock of E. W. Scripps Co. and common stock of West Tacoma Newsprint Co. should be considered current assets. While we agree that the preferred stock was readily convertible into cash, we do not agree that it should be considered a current asset. Petitioner purchased the stock in order to provide a return equal to the return it was required to pay the employees covered by its profit-sharing plan. At the same time, petitioner intended to partially "fund" its fixed liability under the profit-sharing plan. An asset used to fund a fixed liability can no longer be considered as a current asset.[9] For this reason we have not classified the preferred stock investment as a current asset. See *John P. Scripps Newspapers, supra.* The purchase by petitioner of the common stock in West Tacoma Newsprint Co. was a precautionary measure to insure an adequate supply of newsprint. By its ownership of the stock, petitioner was also able to purchase newsprint from this company at a saving over the normal contract price. Clearly, under these circumstances the investment does not fall within the category of a current asset. *Crawford County Printing & Publishing Co., supra; Lion Clothing Co., supra.* An analysis of petitioner's balance sheets reveals that the ratio of current assets to current liabilities for the years in issue, as set forth in our Findings of Fact, averaged 3.85 to 1. This ratio, although somewhat higher than the "rule of thumb," is not in and of itself enough to indicate that the accumulation of earnings was unreasonable. *Sandy Estate Co., supra; Sterling Distributors, Inc.* v. *United States, supra; Breitfeller Sales, Inc., supra; James M. Pierce Corporation, supra.*

Petitioner's operating expenses during the years in issue were $927,966.28 in 1958 and $966,211.66 in 1959. If we were to apply the rule of thumb in this case, clearly, petitioner's accumulated surplus would not be unreasonable. Respondent contends, however, that resort to the rule of thumb in this case is unwarranted because petitioner's ac-

---

[9] Respondent is in agreement with this rule for he states in his reply brief at pages 12 and 12a: "The respondent agrees that where a noncurrent liability is funded that the assets used to fund the liability do not constitute current assets."

counts receivable turned over approximately 10 times a year. Nevertheless, we believe that the rule of thumb does carry some weight in this case where the surplus is only in the neighborhood of three-fourths of the annual operating costs. *John P. Scripps Newspapers, supra; Sterling Distributors, Inc.* v. *United States, supra* at 808; *James M. Pierce Corporation, supra.*

Petitioner, as of December 31, 1957, had an accumulated surplus, including its reserve for liability under the employee profit-sharing agreements, of $667,894.28. In view of petitioner's requirements for expansion, working capital, and contingent liabilities, we are satisfied that the surplus as of this date was not sufficient to meet these needs and that an additional accumulation of earnings during 1958 and 1959 was reasonable. On the other hand, there is evidence that the retention by petitioner of all of its earnings for 1958 and 1959, except for the dividend distribution of $30,000 in each year, was in excess of what was reasonably needed for the business.

Since we are of the opinion that some of petitioner's accumulation during the years in issue was beyond the reasonable needs of the business, we reach next the question of whether petitioner was availed of during the years in issue for the proscribed purpose. In answering this question, we are mindful of the fact that our finding that some part of the accumulation was unreasonable places upon petitioner the burden of showing by a preponderance of the evidence that the proscribed purpose was not present. Sec. 533(a). However, after examining all the evidence of record, we are satisfied that petitioner has sustained its burden. *Duke Laboratories, Inc.* v. *United States, supra; Donruss Co.* v. *United States,* — F. Supp. — (D. Tenn. 1965, 15 A.F.T.R. 2d 896, 65–1 U.S.T.C. par. 9292).

The second part of petitioner's statement contains two grounds which are claimed to give support to the position that the petitioner was not availed of for the proscribed purpose. They are, stated briefly, (1) no loans to the sole stockholder and (2) no investment in unrelated businesses. In addition, the evidence introduced at the trial, as well as supporting those two grounds, reveals a third ground to wit, a history of substantial dividend payments.

These factors are strong indications that the accumulations were not for the proscribed purpose, section 1.533–1(a)(2), Income Tax Regs. Furthermore, there is no doubt that a good history of dividends, the absence of loans to the sole shareholder, the absence of investments in unrelated businesses, and the paying of a large salary to the sole shareholder indicate that the accumulation of earnings and profits was for legitimate business needs. *James M. Pierce Corporation, supra; Gazette Pub. Co.* v. *Self, supra.* We point this out because it is apparent to us that although the directors of petitioner did accumulate too much surplus, they did so thinking it was neces-

sary for the business needs and not because of any desire to avoid the surtax on its sole shareholder. It must be remembered that the gist of the statutory violation is the intent to use the corporation to avoid surtax on its shareholder and not whether the decision to accumulate the income was wisely made. *KOMA, Inc.* v. *Commissioner*, 189 F. 2d 390, 396 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court.

A close examination and comparison of petitioner's contentions with regard to these grounds with the evidence of record reveal that the grounds are readily present here. Petitioner has a history of dividends being paid starting in 1954 and continuing up to and including the years in issue. The record reveals that the amount of petitioner's dividends, expressed in terms of a percentage of net earnings after Federal taxes, was as high as 30.4 percent but never below 27.8 percent. Respondent points to the fact that although petitioner's earnings have increased over the years its dividends have remained constant at $30,000 per year. While this may be true, petitioner itself has not remained constant but has used its increased earnings to expand its operations. It was through the retention of those very earnings that petitioner was able to expand and thereby consistently increase its annual earnings. Petitioner, in our opinion, acted like a prudent businessman, in that it distributed a substantial part of its earnings as a dividend and elected to retain the reminder. *James M. Pierce Corporation, supra.*

Petitioner did not make any loans to Scripps. This is in petitioner's favor. Cf. *Dill Manufacturing Co.*, 39 B.T.A. 1023, 1033 (1939). Furthermore, petitioner did not have any investments in unrelated businesses. The purchase of E. W. Scripps Co. stock, which was readily convertible into cash, was not an investment in an unrelated business but the investing of money retained under its profit-sharing plan which was intended as a partial "funding" of its liability thereunder. *John P. Scripps Newspapers, supra.* Furthermore, as was stated earlier, the purchase of West Tacoma Newsprint Co. stock was for a legitimate business purpose and was clearly not an investment in an unrelated business. *Crawford County Printing & Publishing Co., supra; Lion Clothing Co., supra.* In addition, the purchasing and holding of U.S. Government bonds by petitioner did not, under the facts of this case, represent an investment in an unrelated business nor did it represent an intent on the part of petitioner to avoid Scripps' income tax. Petitioner used the bonds as collateral to obtain outside financing when funds were needed for the business. See *Crawford County Printing & Publishing Co., supra* at 1414; *Sandy Estate Co., supra* at 378.

Respondent argues that the loan by petitioner to Telegram Tribune Co., a corporation controlled by Scripps, indicates that petitioner

had excess cash which could have been distributed, instead, as a dividend. While the business of this corporation cannot be said to be the business of petitioner, both are in the same field (newspaper). The loan made by petitioner was for a relatively short term only and was never used for long-term financing. The loan carried 6-percent interest. Under the facts and circumstances of this case, we are not convinced that this loan requires a holding that the accumulation during the years in issue was for the proscribed purpose.[10]

We are satisfied that petitioner's directors acting for the best interests of petitioner decided, after full discussion, that the retention of petitioner's earnings (except for the part actually distributed as a dividend) was necessary to meet competition, meet business reverses, meet contingent liabilities, meet needs for working capital, and furnish funds for expansion. Although we feel that the total accumulation was somewhat beyond the reasonable foreseeable business needs of petitioner, we are convinced that the only reason for the excessive retention of earnings was the conservative policies of the directors and not their concern for the surtax liability of Scripps. Accordingly, we hold that petitioner, during the years in issue, was not availed of for the purpose of avoiding the income taxes of its sole stockholder by permitting its earnings to accumulate beyond the reasonable needs of its business. *Duke Laboratories, Inc.* v. *United States, supra; Gus Blass Co.*, 9 T.C. 15, 37-40 (1947); *R. C. Tway Coal Sales Co.* v. *United States, supra; Donruss Co.* v. *United States, supra.*

*Decision will be entered for the petitioner.*

---

[10] We are also mindful of the fact that if petitioner paid out all of its earnings during the years in issue as dividends, 'Scripps would have had a heavier personal Federal tax burden. However, we are convinced and have found as a fact that this element did not enter into the decision of the directors regarding the retention of earnings.