The SHAW–WALKER COMPANY, a corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17268.

United States Court of Appeals Sixth Circuit.

Feb. 13, 1968.

John P. Carroll, Jr., New York City, for petitioner, Davis, Polk & Wardwell, New York City, on the brief, Cyrus J. Halpern, J. Anthony Kline, New York City, Edward C. McCobb, Grand Rapids, Mich., of counsel.

Albert J. Beveridge, III, Atty., Tax Division, Dept. of Justice, Washington, D. C., for respondent, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.

PHILLIPS, Circuit Judge.

The taxpayer, the Shaw-Walker Company, seeks review of a decision of the Tax Court finding a deficiency of $1,580,-366.50 for the taxable years 1955, 1956 and 1957 in accumulated earnings tax under Section 531, Internal Revenue Code of 1954, 26 U.S.C. § 531.[1]

The Tax Court agreed with the Commissioner in holding that Shaw-Walker had accumulated earnings to such an extent in prior years that failure of the corporation to distribute all of its current earnings as dividends during the three taxable years in question subjected it to liability for accumulated earnings tax on all its earnings in each of those three years. The Tax Court allowed certain accumulated earnings credits under 26 U.S.C. § 535(c), as hereinafter detailed, but failed to credit them against the tax assessed for any of the taxable years in question because of excessive accumulations during prior years. The result was to tax all the net earnings of the taxpayer for each of the taxable years.

The ultimate findings of fact made by the Tax Court were that during each of the taxable years the taxpayer permitted its earnings and profits to accumulate beyond the reasonable needs, including the anticipated needs, of the business and that during each of these years the corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of dividing or distributing them.

The statement of the taxpayer submitted pursuant to § 534(c) of the Internal Revenue Code, 26 U.S.C. § 534(c),[2] which is discussed hereinafter, is filed as an appendix to this opinion. For a more complete statement of facts, reference is made to this appendix and to the Memorandum Findings of Fact and Opinion of the Tax Court, T.C. Memo, 1965–309. The facts will be stated here only to the extent necessary to dispose of the issues discussed in this opinion.

---

1. "§ 531. Imposition of accumulated earnings tax

"In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in Section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

"(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

"(2) 38½ percent of the accumulated taxable income in excess of $100,-000."

2. "(c) Statement by taxpayer.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business."

Shaw-Walker was founded by two partners in 1899 with an initial capital of $3,500. At its inception the corporation sold card indexes. During the taxable years the corporation manufactured and sold more than 5,000 different products and advertised that it supplied "everything for the office except machines," principally office furniture, filing supplies and filing equipment.

Management and manufacturing headquarters of the corporation are in Muskegon, Michigan. It sells its products through eighteen branch offices and through numerous local office equipment dealers. For the taxable years annual sales ranged from $22 million to $24 million.

The Walker family has managed the corporation's affairs since 1903 and during the taxable years owned approximately 65 to 70 per cent of its common stock.

No stock was held by or available to the public. The Tax Court found that Shaw-Walker was managed informally:

"Prior to and during the taxable years the executives located in Muskegon constituted a majority of the board of directors. These executives operated the petitioner by the method of daily consultation since they saw each other almost daily and sometimes many times a day. When matters came up that had to be solved they were able to discuss their problems with L. C. Walker and have a decision made. Thereafter, the decisions and actions of the executives were simply ratified or approved by the board of directors."

The corporation paid the following salaries and dividends to members of the Walker family during the years 1954–1957:

| Calendar Year | L. C. Walker | | Shaw Walker | |
| --- | --- | --- | --- | --- |
| | Dividends | Compensation | Dividends | Compensation |
| 1954 | $179,171 | $25,000 | $145,100 | $15,000 |
| 1955 | 179,721 | 35,417 | 145,070 | 17,083 |
| 1956 | 213,195 | 50,000 | 174,048 | 20,000 |
| 1957 | 213,845 | 50,000 | 174,048 | 21,667 |

Dividends also were paid to other members of the Walker family who held stock but were not employed by the corporation.

Substantial dividends were paid to stockholders for the years immediately prior to 1954:

| Year Ended June 30 | Earnings of the Company After Federal Income Taxes | Dividends Distributed |
| --- | --- | --- |
| 1946 | $ 195,030 | $163,523 |
| 1947 | 1,406,620 | 402,657 |
| 1948 | 1,514,757 | 397,670 |
| 1949 | 1,463,724 | 590,529 |
| 1950 | 1,448,207 | 638,534 |
| 1951 | 1,580,796 | 635,884 |
| 1952 | 1,604,558 | 576,857 |
| 1953 | 1,377,589 | 638,901 |

Between the taxable years ended June 30, 1946, and June 30, 1957, the company's earnings after taxes were $18,-385,892 and during those years it distributed $6,833,631 in dividends.

The following data is also relevant:

| Year Ended June 30 | Net Taxable Income Less Provision for Taxes | Dividends Distributed | Earnings Retained in the Business | Percentage of Net Income (after taxes) Distributed as Dividends |
|---|---|---|---|---|
| | | | | (%) |
| 1955 | $1,460,655.77 | $629,646.70 | $ 831,009.07 | 43.1 |
| 1956 | 2,490,240.09 | 792,604.57 | 1,697,635.52 | 31.8 |
| 1957 | 2,519,342.72 | 856,071.51 | 1,663,271.21 | 33.9 |

The Tax Court found that it was the taxpayer's policy to finance its growth out of its retained earnings and that the last time Shaw-Walker owed money to a bank was in 1938.

Unless a corporation can prove to the contrary by a preponderance of the evidence, the fact that its earnings and profits are permitted to accumulate beyond the reasonably anticipated needs of the business is determinative of the purpose to avoid the income tax in applying the accumulated earnings tax. 26 U.S.C. § 533(a).[3] If the taxpayer is able to prove that it accumulated all or any part of its earnings to meet its reasonable business needs, this amount is allowable as a credit against its accumulated earnings tax. 26 U.S.C. § 535(c). Upon receipt of the Commissioner's proposed notice of deficiency, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) upon which it relies to show that the accumulations were for its reasonable business needs. When a § 534(c) statement is filed by the taxpayer in proper form to meet the requirements of the statute, the burden of proving that earnings and profits were accumulated beyond the reasonable needs of the business shifts to the Commissioner. 26 U.S.C. § 534(a).[4]

Although the fact that the corporation was availed of for the proscribed purpose may be proved by the accumulation of earnings and profits beyond its reasonably anticipated business needs, the purpose to avoid shareholder income tax may also be proved by other circumstances:

"(2) The existence or nonexistence of the purpose to avoid income tax with respect to shareholders may be indicated by circumstances other than

3. "§ 533. Evidence of purpose to avoid income tax

"(a) Unreasonable accumulation determinative of purpose.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

4. "§ 534. Burden of proof

"(a) General rule.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

* * * * * * *

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

the conditions specified in section 533. Whether or not such purpose was present depends upon the particular circumstances of each case. All circumstances which might be construed as evidence of the purpose to avoid income tax with respect to shareholders cannot be outlined, but among other things, the following will be considered:

"(i) Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit of the shareholders.

"(ii) The investment by the corporation of undistributed earnings in assets having no reasonable connection with the business of the corporation (see § 1.537–3), and

"(iii) The extent to which the corporation has distributed its earnings and profits."

Treas.Reg. § 1–533–1.

■ The issues of whether accumulations are beyond the reasonable needs of the business and whether a corporation has been availed of for the proscribed purpose present questions of fact. The Tax Court's findings of fact may be set aside on review only if they are clearly erroneous. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Kirlin Corp. v. C. I. R., 361 F.2d 818 (6th Cir.).

### 1) Burden of Proof

One of the issues to be determined is whether the § 534(c) statement filed by the taxpayer (appendix hereto) was sufficient to shift to the Commissioner the burden of proving that all or any part of the net earnings and profits were permitted to accumulate beyond the reasonably anticipated needs of the business.

Prior to the trial the taxpayer filed a motion asking the Tax Court to determine that its statement satisfied the requirements of § 534(c) and that the Court determine that the burden of proof had shifted to the Commissioner. The Tax Court denied this motion and ruled that "the interests of both parties as well as that of the Court will best be served by allowing this question to be disposed of at or after trial." 39 T.C. 293.

In the hearing before the Tax Court the Commissioner contended that Shaw-Walker's § 534(c) statement was nothing more than a generalized claim that the corporation needed all the earnings and profits which it accumulated and that the statement failed to set forth specific amounts with facts to support the alleged grounds. The Tax Court found the statement deficient in that it lacks:

"* * * the requisite specificity and definiteness envisaged by the statute. While the grounds and the facts alleged in its statement may have revealed petitioner's position to the respondent, R. Gsell & Co. v. Commissioner [of Internal Revenue], 294 F.2d 321 (C.A. 2, 1961), we are unable to hold that petitioner's statement was sufficient to shift the burden to respondent."

The Tax Court then hedged its ruling on the burden of proof issue by stating that "regardless of where the burden of proof lies, the affirmative evidence of record is sufficient to determine this case on its merits."

■ A § 534(c) statement may be sufficient to shift the burden of proof to the Commissioner as to some grounds and leave the burden of proof on the taxpayer as to other grounds alleged in the statement. Bremerton Sun Publishing Co., 44 T.C. 566 at 581–582.

The taxpayer's § 534(c) statement (appendix hereto) sets forth five grounds upon which the taxpayer relies to establish that its earnings and profits were not permitted to accumulate beyond the reasonable needs of the business: (1) Requirements for working capital; (2) replacement of fixed assets; (3) plans for development of "The Timer," de-

scribed as "the Company's newest product;" (4) retirement of executive stock;[5] and (5) accumulations for deposits in banks which were customers of the taxpayer, for the purpose of stimulating sales to banks.

With respect to the last four enumerated grounds, we cannot say that the Tax Court erred in holding that the § 534(c) statement lacks the requisite specificity and definiteness envisaged by the statute. For example, we agree that the statement concerning the development of "The Timer" fails to set forth with sufficient detail and definiteness the earnings which the taxpayer reasonably anticipated during the taxable years in question should be accumulated for this purpose.

■ We therefore hold that the Tax Court did not commit reversible error in holding that the burden of proof remained on the taxpayer to establish that earnings and profits accumulated for these four purposes were not beyond the reasonable needs of the business.

■ On the issue of the amount of working capital reasonably necessary to conduct ordinary operations of the business, we hold that the § 534(c) statement was sufficient to shift the burden of proof to the Commissioner and that the Tax Court erred in ruling to the contrary. Shaw-Walker's § 534(c) statement explains at some length its working capital needs and supplies nine exhibits upon which the corporation relied.[6] These exhibits include the following specific statistical data: Comparative working capital by years during the postwar period; changes in the company's working capital during the postwar period and analysis of funds; analysis of the company's month-end balances of inventories and of accounts receivable and of its average balances of inventories and

of accounts receivable; computation of the company's business cycles for seven years; and comparison between the projected minimum working capital requirements of the corporation computed statistically and those determined by the company's management for the taxable years.

The case law requires a certain amount of specificity in a § 534(c) statement as to the facts upon which the reliance is based. Electric Regulator Corp., 40 T.C. 757, 764, reversed on other grounds, Electric Regulator Corp. v. Commissioner of Internal Revenue, 336 F.2d 339 (2d Cir.); Factories Investment Corp., 39 T.C. 908, 915, aff'd, Factories Investment Corp. v. Commissioner of Internal Revenue, 328 F.2d 781 (2d Cir.).

As the Second Circuit has stated in Gsell & Co. v. C. I. R., 294 F.2d 321 at 326:

"[I]n close cases the determination of who has the burden of proof on the unreasonable accumulations issue must be resolved. The party having the burden of proof does not merely have the burden of coming forward with evidence; it has the burden of persuasion and once fixed that burden does not shift."

2) Determination of Working Capital

The Tax Court made detailed findings of fact as to the amounts required by Shaw-Walker for replacement of fixed assets, development of the Timer and repurchase of executive stock, and held that no amounts were allowable as accumulations for bank deposits with potential equipment customers. We conclude that the Tax Court was not clearly erroneous in its holding on these four issues.

■ Unlike its detailed study of the capital requirements for the four special

---

5. None of the executive stock was held by members of the Walker family. This stock was issued as a means of compensating higher level executives, as outlined in detail in the appendix. The Tax Court held this to be a proper purpose for accumulating earnings.

6. The exhibits to the statement are not printed, in the interest of avoiding further lengthening of the appendix. The exhibits relating to working capital are explicit and detailed.

needs set out above, the Tax Court failed to make a factual finding of Shaw-Walker's anticipated needs for working capital in its normal business operations. The Tax Court acknowledged its summary consideration of the corporation's working capital requirements: "There is no need for us to determine precisely petitioner's reasonable needs for working capital to be used in the normal conduct of its business operations, or its reasonably anticipated needs for such purpose, during the years in issue." The Tax Court relied upon three factors to justify its finding that "there was at least $3,-000,000 of available working capital in the form of accumulated earnings and profits in each taxable year that was not used, needed, or reasonably anticipated as being needed by petitioner in the normal conduct of its business operations."

First, the Tax Court found that Shaw-Walker had the following amounts of working capital available at the close of each taxable year and that Shaw-Walker's § 534(c) statement asserted its management had projected that it would need the following amounts of working capital for those years:

|  | 1955 | 1956 | 1957 |
|---|---|---|---|
| Working Capital Available | 9,014,372 | 10,407,227 | 12,154,469 |
| Working Capital Projected | 9,000,000 | 9,500,000 | 10,000,000 |

Even though the corporation's own statement shows that there was a greater amount of working capital available than the company had projected it would require, the disparity in none of the taxable years justifies the Tax Court's conclusion that "there was at least $3,000,-000 of available working capital * * * in each taxable year that was not used, needed or reasonably anticipated as being needed. * * *" The Treasury Regulations, § 1.537–1(b) (2), forbid retrospective use of data in determining whether the retention of earnings and profits was unreasonable: "Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year."

Second, the Tax Court seized upon certain remarks of the taxpayer's treasurer appearing in the corporate minutes to the effect that "these requirements, plus something for charity and the balances needed in our depository banks in the normal course of our business, can reasonably be expected to total five to five and one-half million dollars." These remarks were made in June 1957 in anticipation of the company's needs for the year ending in June 1958. The year 1958 is not in issue in this action. In June 1956 the same corporate officer had said: "The Company does not have funds on hand in excess of its current operating needs to meet the total of these requirements." In 1957 the working capital was $12.1 million and in 1956 $10.4 million which the treasurer had deemed "not * * * in excess of it current operating needs."[7]

The third factor upon which the Tax Court relied was the ratio of current assets to current liabilities for the years in question: 4.75, 3.89, and 4.70 to 1. For the reasons discussed in Apollo Industries Inc. v. C. I. R., 358 F.2d 867 (1st Cir.) and in Smoot Sand & Gravel Corp. v. C. I. R., 241 F.2d 197 (4th Cir.), cert.

7. Obviously we do not hold that the statements of the treasurer must be taken by the Tax Court at face value; the statements are compared only to illustrate that the Tax Court's reliance on one isolated statement does not reflect correctly the stated opinion of the taxpayer's treasurer considered as a whole.

denied, 354 U.S. 922, 77 S.Ct. 1383, 1 L. Ed.2d 1437, a mere superficial test of liquidity is virtually meaningless without a determination of the existence or non-existence for the reasonably anticipated needs for the maintenance of liquidity. Electric Regulator Corp. v. C. I. R., 336 F.2d 339, 344 (2d Cir.).

In *Smoot* Judge Sobeloff said:

"Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors." 241 F.2d at 207.

█ Another factor relevant in the present case is the fact that Shaw-Walker relies solely upon internally generated funds to supply its working capital needs and does not borrow from banks. The fact that a taxpayer has financed its growth from retained earnings rather than from the sale of additional stock or commercial borrowing "should not place it in a position of being subjected to a penalty tax under Section 531." Bremerton Sun Publishing Co., 44 T.C. 566 at 584.

The following statement from *Smoot* is particularly applicable to the failure of the Tax Court to analyze Shaw-Walker's working capital needs:

"In our view, the Tax Court should make a determination of petitioner's working capital needs based upon the foregoing considerations. A clear disclosure of the method by which the Court computed the working capital required would not only go a long way to dispose of the issues in the instant case but could be useful to the legal and accounting professions as a future guide." 241 F.2d at 207.

In *Apollo,* 358 F.2d 867, the First Circuit emphasized the need for a particularized analysis of the corporation's working capital requirements:

"[3] We do not think that a summary view of the balance sheet, or of working capital, or even of the amount of net liquid assets can give a court enough of an appreciation of the real needs of a business for operating funds. Business decisions are not made on the basis of information collected at arbitrary dates. They take into account the timing of needs and availability of resources. And so should judicial attempts to deal justly with these decisions. But to ascertain such needs and the resources available, we are required to go behind the simple balance sheet presentation of assets and liabilities." 358 F.2d at 871.

In the present case there has been no analysis of the corporation's working capital based on a determination of the funds required to operate throughout an entire operating cycle with internally generated funds. A determination of requirements for such extraordinary needs as development of new products and repurchase of executive stock may be relatively insignificant as compared to amounts required for working capital required to conduct normal business operations. An operating cycle begins when cash is converted into raw materials or inventory and ends when the receivables are collected from the sale of finished goods.

In examining the reasonably anticipated demands for funds, it has been said that the anticipations of "[a] closely held corporation cannot be held to the same strict formalities of large public corporations." Bremerton Sun Publishing Co. v. C. I. R., 44 T.C. 566 at 584–585. Cf. Duke Laboratories, Inc. v. United States, 222 F.Supp. 400, 412 (D.Conn.), aff'd 337 F.2d 280 (2d Cir.).

In essence the Tax Court, although referring to the standards set out in *Smoot,* disregarded these standards in its examination of Shaw-Walker's working capital requirements.

We hold that the Tax Court erred in failing to make the necessary detailed analysis and findings of fact relative to the anticipated needs of the taxpayer for working capital in its normal business operations.

In this connection the taxpayer contends that the Tax Court erred in failing to apply the so-called "one-year" rule or "rule of thumb" in determining the reasonableness of a corporation's accumulations for working capital. The "one year rule" provides that an accumulation of earnings to meet operating expenses for at least one year is reasonable. Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 241 F.2d 197, 207; Bremerton Sun Publishing Co., 44 T.C. 566, 586–587; J. L. Goodman Furniture Co., 11 T.C. 530. However, it has been held that the "one year rule" does not apply as a matter of law to every situation:

"Finally, petitioner contends that under the Tax Court's own rulings in J. L. Goodman Co. v. Commissioner, 11 T.C. 530 and F. E. Watkins Motor Co., 31 T.C. 288 (footnote 7: 'This Court has consistently held that the accumulation of funds to meet operational expenses for at least one year is reasonable') that its retention of the earnings and profits is *per se* reasonable in the context of its business, which incurs gross operating costs of over one million dollars per year.

"[4] The rule of thumb so stated may be one proper for administrative convenience but should rise to no higher level. The search must always be concerned with the needs of the particular business as they existed during the particular year. KOMA, Inc. v. Commissioner [of Internal Revenue], 10 Cir., 189 F.2d 390; World Pub. Co. v. United States, 10 Cir., 169 F.2d 186; Hemphill Schools, Inc. v. Commissioner [Internal Revenue], 9 Cir., 137 F.2d 961; Pelton Steel Casting Co. v. Commissioner [Internal Revenue], 7 Cir., 251 F.2d 278."

Dixie, Inc. v. Commissioner of Internal Revenue, 277 F.2d 526 at 528 (2d Cir.), cert. denied, 364 U.S. 827, 81 S. Ct. 62, 5 L.Ed.2d 54.

■ We hold that the Tax Court did not err as a matter of law in failing to apply the one year rule. Under the facts of this case, we consider that a determination of working capital reasonably required for the taxpayer's business cycle is more pertinent than application of the one year rule.

### 3) Intent

■ Unless the corporation proves to the contrary by the preponderance of the evidence, the fact that its earnings and profits are permitted to accumulate beyond the reasonable needs of the business will be determinative of the purpose to avoid income tax with respect to its shareholders. 26 U.S.C. § 533(a) (footnote 3). In determining liability for accumulated earnings tax, the ultimate issue is intent. This is demonstrated by the fact that a company with unreasonable accumulations may be found not liable. Duke Laboratories, Inc. v. United States, 337 F.2d 280 (2d Cir.); Bremerton Sun Publishing Co., 44 T.C. 566. On the other hand:

'[I]f the proscribed purpose is present, the accumulated earnings tax may be imposed even though the accumulation is reasonable. United States v. R. C. Tway Coal Sales Co. [75 F.2d 336 (6th Cir.)]; Whitney Chain & Mfg. Co. v. Commissioner [of Internal Revenue], 149 F.2d 936 (CA 2, 1945); Pelton Steel Casting Co. v. Commissioner [of Internal Revenue], 251 F.2d 278 (CA 7, 1958)." Donruss Co. v. United States, 384 F.2d 292, 294 (6th Cir.).

The only portion of the Tax Court's opinion which deals with the issue of intent is as follows:

"In concluding that the record evidence herein is insufficient to prevent the imposition of the accumulated earnings tax we have also weighed the factors that favor petitioner, such as its dividend record, its competition, the stockholders' attendance at meetings in person or by proxy, the complexities of the office equipment industry, the informal manner in which many of petitioner's business transactions were handled, the business policies of L. C. and Shaw Walker and all other facets of this voluminous record. We have

concluded that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business. It follows from this holding that petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders unless proved to the contrary by the preponderance of the evidence. This the evidence fails to prove, * * *"

As the Tax Court indicates, there are a number of factors which serve to weaken or strengthen the statutory presumption created by unreasonable accumulat.ons. Among these factors are: expenditure of corporate funds for shareholder's personal benefit, withdrawals by shareholders of corporate funds as personal loans, and investment of accumulated corporate funds in unrelated activities. Another significant factor is the extent to which the corporation has distributed its earnings and profits. Treas.Reg. § 1.-533.1.

With respect to these factors, the Tax Court specifically found:

(1) "The petitioner did not lend money to its shareholders for the purpose of withdrawing earnings in such a way as to reduce, avoid, or minimize income taxes on its income or the distribution of such income."

(2) "The petitioner has never expended funds for the maintenance of personal living quarters, vacation facilities, resort properties, private automobiles or airplanes, or private travel for its shareholder employees."

(3) Petitioner held no corporate stock which was unrelated to its business.

(4) For the taxable years in question petitioner made the following dividend distributions:

| Year Ended June 30 | Net Taxable Income Less Provision for Taxes | Dividends Distributed | Earnings Retained in the Business | Percentage of Net Income (after taxes) Distributed as Dividends |
|---|---|---|---|---|
| | | | | (%) |
| 1955 | $1,460,655.77 | $629,646.70 | $ 831,009.07 | 43.1 |
| 1956 | 2,490,240.09 | 792,604.57 | 1,697,635.52 | 31.8 |
| 1957 | 2,519,342.72 | 856,071.51 | 1,663,271.21 | 33.9 |

During the tax years Shaw-Walker increased its dividend from $5.00 per share in fiscal 1955 to $6.50 per share in fiscal 1956 to $7.00 per share in fiscal 1957.

Without articulating its reasoning, the Tax Court held that its findings on the foregoing factors were not sufficient to rebut the presumption created by the accumulations of earnings and profits which it found to be unreasonable.

In support of its conclusion on the issue of intent the Tax Court found that:

"During each of the calendar years 1954 through 1958, L. C. Walker and Shaw Walker were in the following individual income tax brackets:

| Calendar Year | L. C. Walker | Shaw Walker |
|---|---|---|
| | (%) | (%) |
| 1954 | 84 | 78 |
| 1955 | 81 | 78 |
| 1956 | 89 | 81 |
| 1957 | 91 | 87 |
| 1958 | 91 | 78" |

■ The high tax brackets of the stockholders is not necessarily a controlling factor in determining liability for the accumulated earnings tax. Young

Motor Co. v. Commissioner of Internal Revenue, 281 F.2d 488, 491 (1st Cir.). This is especially true in the present case, where the dividends paid to L. C. Walker and Shaw Walker during each of the taxable years substantially exceeded their salaries, as hereinabove set forth in detail at page three.

In its determination of whether the proscribed purpose existed the Tax Court did not state its standard of the quantum of purpose that must exist before accumulated earnings taxes may be imposed. (i. e. sole purpose, dominating purpose or one purpose.) In Donruss Co. v. United States, 384 F.2d 292, 298, this Court held that "tax avoidance must be the dominant, controlling, or impelling motive behind an accumulation in order to impose the accumulated earnings tax." Accord, Young Motor Co. v. Commissioner of Internal Revenue, 281 F.2d 488 (1st Cir.). Cf. Trico Products Corp. v. Commissioner of Internal Revenue, 137 F.2d 424 (2d Cir.), cert. denied, 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482.

We therefore hold that the Tax Court did not make sufficient findings of fact in this case on the issue of intent.

4) Accumulated earnings credit

26 U.S.C. § 535(c) provides for an accumulated earnings credit against the accumulated earnings tax, reflecting "an amount equal to such part of the earnings and profits for the taxable year as are re-

tained for the reasonable needs of the business, * * *."

On three of the disputed issues, the Tax Court made specific findings of amounts that were reasonably accumulated by the taxpayer for the taxable years in question:

(1) $350,000 for each taxable year for replacement of fixed assets;

(2) $150,000 for each taxable year for development of "The Timer;" and

(3) $200,000 for 1955, $225,000 for 1956 and $295,000 for 1957 for retirement of executive stock.

We agree with the holding of the Tax Court on these three issues and find that they are supported by substantial evidence.

However, after expressly determining these accumulations to be reasonable, the Tax Court did not allow them as credits in calculating the accumulated earnings tax for any of the years in question, holding that the accumulations in prior years were so substantial that no accumulated earnings credit should be allowed in computing the tax for 1955, 1956 and 1957. In an appropriate case this treatment apparently finds support in the Regulations.[8]

The total disallowance of the accumulated earnings credit in appropriate cases also seems to find support in the legislative history.[9]

---

8. Treas.Reg. § 1.535–3(b) (ii):
"(ii) In determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration. Thus, for example, if such accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, then any earnings and profits of the current taxable year which are retained will not be considered to be retained for the reasonable needs of the business."

9. Senate Finance Committee Report on Internal Revenue Code of 1954, U.S. Code Congressional & Administrative News, 1954, Vol. 3, at p. 4957:
"Under subsection (c), as revised, the accumulated earnings credit, in the case

of a corporation other than a mere holding or investment company, is an amount equal to the excess of such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business over the deduction allowed by subsection (b) (6) for long-term capital gain. The amount of the earnings and profits which are retained during any taxable year is the amount by which the earnings and profits for such year exceed the dividends paid deduction (as defined in section 561) for such year. In determining the portion, if any, of the earnings and profits for a taxable year which may be retained for the reasonable needs of the business, the amount of the earnings and profits accumulated in prior years shall, of course, be taken into account."

Although we are somewhat startled by a decision that expressly allows accumulated earnings credits for each of the taxable years with one hand and takes these credits away with the other hand, we do not express an opinion as to whether the amount of accumulations which were found by the Tax Count to be reasonable for the taxable years should be allowed in calculating accumulated earnings credits for the taxable years under § 535(c). The Tax Court is directed to reconsider this question on remand.

Because of our finding of the errors hereinabove described in the decision of the Tax Court, we also reserve decision on the ultimate question as to whether the Tax Court was correct in holding that the taxpayer corporation was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed.

Upon remand, the Tax Court may consider evidence previously taken and now on file and such additional evidence on any issue not disposed of in this opinion as may be admissible and relevant. Any party shall be accorded the right to require the presence of any previously sworn witness for additional testimony either on direct or cross-examination. On remand the burden of proof on the issue of reasonable needs for working capital in the normal business operations of the taxpayer as set forth in the appendix to this opinion will be on the Commissioner. The Tax Court will make additional findings of fact on the questions which we have delineated as to working capital, intent and whether the amounts allowed as reasonable accumulations shall be considered in computing accumulated earnings credits for the taxable years under 26 U.S.C. § 535(c).

The decision of the Tax Court is vacated. Remanded for further proceedings not inconsistent with this opinion.

## APPENDIX

Statement Pursuant to Section 534 of the Internal Revenue Code

In the Matter of Deficiencies in Accumulated Earnings Tax Proposed with Respect to the Taxable Years of THE SHAW-WALKER COMPANY Ended June 30, 1955, June 30, 1956 and June 30, 1957.

### GROUNDS FOR THE RETENTION OF EARNINGS AND PROFITS

In response to a notification dated June 22, 1960 (a copy of which is attached hereto as Appendix A) and a letter dated July 29, 1960 (a copy of which is attached hereto as Appendix B) granting an extension of time within which to file a statement pursuant to Section 534 of the 1954 Internal Revenue Code, The Shaw-Walker Company (hereinafter sometimes referred to as the "Company") submits below the grounds (together with facts sufficient to show the basis thereof) upon which it relies to establish that, at the end of each of its taxable years ended June 30, 1955, June 30, 1956 and June 30, 1957 no part of its retained earnings and profits was accumulated beyond the reasonable needs of its business.

That portion of its earnings and profits which was retained by the Company as of June 30, 1955, June 30, 1956 and June 30, 1957 was retained:

1. To meet the needs of the Company for working capital with which to conduct the normal operations of its business.

2. To provide funds necessary for the replacement of its fixed assets.

3. To provide funds for the development, production and distribution of a new product, the TIMER.

4. To provide funds for the repurchase of its Executive Stock pursuant to a plan upon which the holders of this stock had relied and were then relying.

5. Because, pending their use for the above purposes, the Company could and did use a substantial portion of its retained earnings and profits as a means for increasing its sales to banks and thereby increasing its operating profits.

The facts which are the basis of the above grounds for the retention of the Company's earnings and profits are set out in this statement and in the appendices to it which are hereby incorporated by reference and made a part of this statement.

## THE NATURE AND DEVELOPMENT OF THE COMPANY AND ITS BUSINESS

The Shaw-Walker Company was organized in 1899 by Mr. L. C. Walker and Mr. A. W. Shaw. It was formed with less than $1,000 of cash capital, and a $2,500 "bonus" under a plan developed by local businessmen to save the city of Muskegon after the collapse of the lumber industry in western Michigan. The Company began business in a rented space 36 by 70 feet. Its original business was cutting and printing index cards which it sold (in purchased wooden cabinets) as card systems. Its present product lines have developed step by step from these card systems and cabinets.

In 1900 the Company constructed its first plant and office building, a one-story frame structure. By June 30, 1957 the Company's facilities had expanded into a manufacturing headquarters at Muskegon consisting of a series of plants and an office building, eighteen branch sales offices (all but one with its own warehouse) in major cities in the United States, and a manufacturing facility in Kalamazoo owned by a corporation in which the Company owns 75% of the stock outstanding. Major steps in the expansion of various aspects of the Company's business are shown in tabular form in Appendix C.

In 1902 Mr. Shaw began to devote his principal attention to SYSTEM, a magazine also founded by Mr. Shaw and Mr. Walker. In 1903 Mr. Shaw moved from Muskegon to Chicago to direct the Company's recently established Chicago branch and the publication of SYSTEM. Shortly thereafter Mr. Shaw withdrew from active participation in the Company's business as an executive (although he continues to be a director) and devoted himself to the magazine publishing business. Beginning with that time and continuing through the three fiscal years in question the Company's management has been under the direction of Mr. Walker.

The Company's development has proceeded in a chain of closely related events which reach back to its original card system business. From the beginning the Company has sold its products largely by providing skilled assistance to its customers and thereby enabling them to employ these products efficiently. Through the contacts between its branch salesmen and field representatives and its customers, the Company has had a constant source of information concerning the needs of users of office equipment. The Company has to expand its product lines constantly to meet the needs of its customers more adequately. For some time the Company has advertised that it makes and sells "Everything for the Office Except Machines."

By the close of its fiscal year ended June 30, 1957 the Company was manufacturing some five thousand different products which required for their illustration and description a printed catalogue—"Office Guide"—of over two hundred and forty pages. The constantly increasing number of separate products offered by the Company is illustrated by a comparison between its recent price lists and those of past years. See Appendix D.

In 1957 the Company's products were sold through its branches [1] and through several hundred dealers. They included filing cabinets of every type; fire-protective filing and record storage equipment; desks; chairs; looseleaf forms

---

[1]. The Company's branches are a particularly important aspect of its business and the facts with respect to them are stated in further detail below.

and indexes, ledger forms and other printed paper supplies for use in various machine accounting systems; multiple writing boards with spot-carbon forms adapted to a variety of accounting operations for which machine accounting is uneconomical; filing folders and indexing devices of all types; and a specialized line of counters, record storage facilities and related equipment for use in banks.

The Company is part of an increasingly competitive industry. The Census of 1954 shows that seventy-seven business enterprises then manufactured filing accessories, one hundred and twelve manufactured wooden office furniture, and one hundred and twenty-nine manufactured metal office furniture. The National Stationery and Office Equipment Association estimates that there were in 1958 about 250 firms engaged in the manufacture of office furniture and about 1,000 engaged in the manufacture of office supplies.

### The Company's Branches

The development of the Company's branch system is shown in outline form in Appendix C. This branch system is of primary importance to the Company in its financial planning and its operations.

The Shaw-Walker Company is one of the four companies in the office equipment industry which maintain extensive systems of branch sales offices. The sales forces in these branches are important to the Company in two respects. First, by maintaining direct contact with its customers through branch sales offices, the Company is able to keep well informed of the needs of its customers and to develop its product lines accordingly. Second, the Company's branch sales force is particularly qualified to sell its products by demonstrating to potential customers the cost savings that will result from their use.

Both advantages of the Company's branch sales system are illustrated by the development of its "Kopi-Spot" accounting systems.[2] Both the development and the sale of these systems have depended entirely upon continuing frequent contacts between the Company and those who use these products and upon the Company demonstrating the economies which can be achieved through their use. Approximately 90% of all Kopi-Spot products are sold through the Company's branches rather than through dealers. Since the end of World War II the sale of Kopi-Spot accounting systems has been the most rapidly growing aspect of the Company's business. See Appendix L.

On the other hand, the Company is committed to heavy fixed charges as the result of maintaining its branch system. Its branch sales offices are all located in the central business districts of major cities. During the years in question, the Company was obligated to pay about $300,000 per year for the rental of the quarters occupied under leases by its branch stores and warehouses. The Company's branch system also requires keeping an experienced sales force in existence through periods (such as the recession of 1958) in which it does not produce sales commensurate with its expenses and requires the constant training of new salesmen at great expense. The Company's branch system also requires the maintenance of substantial stocks of inventory for display and delivery at many points in the country. Accordingly, the demands of its branch sales system are a major factor in the Company's financial planning.[3]

### Management

During the early years of the Company, Mr. L. C. Walker was one of its principal executives. He became President

---

2. These are discussed in further detail in the portion of this statement dealing with the Timer.

3. During the depression of the early 1930's the Company suffered net operating losses for the years ended June 30, 1931, June 30, 1932 and June 30, 1933. It would have made a profit from operations in each of these years had it not been for the losses experienced by its branch sales offices.

in 1908 and from that time through the years in question the management of the Company was under his direction. It has always been the policy of the Company to fill its principal management positions by promoting employees who have become thoroughly familiar with its business through substantial periods of service.

The Company's management consisted, during its fiscal years ended June 30, 1955, June 30, 1956 and June 30, 1957 of the seven men whose positions in and service with the Company are described in Appendix E. At least since 1933, all the Company's directors except Mr. Shaw have been active executives. The Company's Board of Directors functions without committees, and there are no policy-making committees of the management group.

### Postwar Period

The Company's development has not proceeded at a uniform rate. Between its organization in 1899 and the business boom of the late 1920's it expanded to a point at which its gross sales reached $5,535,000 in 1929. Its business declined rapidly during the depression of the 1930's and its gross sales were less than $1,400,000 in 1933. Between the depression of the early 1930's and the end of its fiscal year ended June 30, 1940 (the Company's last prewar fiscal period) the Company gradually increased its sales, but did not achieve again the level of 1929.

During World War II the Company's civilian business in steel equipment was suspended. During the World War II period, the Company's sales reached $9,500,000 in its fiscal year ended June 30, 1945.[4] More than two-thirds of its business during this period was military business and a very substantial portion of it was subcontracted.

During the first year of postwar reconversion, the Company's gross sales (excluding war contract termination payments) were $4,072,000. In the Company's fiscal year ended June 30, 1956 its gross sales were $24,450,000, and were approximately the same during the next fiscal year. The growth of the Company's sales and earnings after taxes are shown graphically in Appendix F.

Between the end of World War II and June 30, 1957 (a period which is referred to in this statement as "the postwar period") the Company has been growing more rapidly than at any other time in its sixty-year history. The Company's sales during the last year of this period were almost exactly six times those of the first year. By the end of the postwar period its volume of business was more than four times that which it had achieved during the business boom of the late 1920's—its previous peacetime high point.

### FINANCIAL HISTORY

The growth of The Shaw-Walker Company's business has been financed through debt, preferred stock, common stock and retained earnings. However, the Company has not borrowed money since 1938, and its preferred stock has been completely retired. Thus, the Company's present financing consists of a small investment in its common stock and the retained earnings and profits allocable to such stock. During the years in question, the Company had notes receivable from two stockholders which were in the original principal amount of $3,000, but which had been reduced to $900 by June 30, 1957. The two stockholders who were obligated on these notes owned, between them, less than one-quarter of one per cent of the Company's stock outstanding during the years in question.

### COMMON STOCK

The Company originally issued 200 shares of common stock with a par value of $10 per share for cash and services. There was never any additional cash investment in Shaw-Walker's common stock, except through the purchases of Executive Stock which are described in the portion of this statement dealing with this class of stock.

---

4. Earnings after taxes for this year were less than $350,000.

## Preferred Stock

Early in 1903 the Company authorized its first issue of preferred stock in order to acquire the assets of the Muskegon Cabinet Company. Thereafter, preferred stock was issued from time to time. The last issue of preferred stock for cash or property was in the fiscal year ended June 30, 1931, a year in which preferred stock outstanding was at its maximum. The last issuance of preferred stock occurred as part of a recapitalization in 1936. Pursuant to sinking fund provisions to which the preferred was subject at all times, all the preferred stock has been retired. The last was called for redemption on July 5, 1955. A chronological summary of the Company's issues of preferred stock is attached as Appendix G. Of the payments to preferred stockholders upon the retirement of this issue of stock in 1955, only 11.5% were made to holders of common stock.

The Company retired its outstanding preferred stock in 1955 in advance of the last retirement date permitted by the sinking fund provisions. It did so because:

(1) It had been advised by counsel on November 9, 1945 that any preferred shareholder could, on his own motion, demand a redemption of his shares at any time after July 5, 1950.

(2) The effect of having preferred stock outstanding was, from the Company's point of view, equivalent to borrowing funds equal to the par value of this stock at an interest rate of 10% per annum.

## Dividends

The Company's dividend policy has always been to distribute as dividends any funds available and not needed in its business, but the management has never attempted to maintain distributions of a predetermined dollar amount or a predetermined percentage of earnings. Between the end of World War II and the end of the last year in question (June 30, 1957), the Company's earnings after taxes were $18,286,983. During that same period the Company distributed $6,833,632 in dividends on its common and preferred stock, or slightly more than 37% of its earnings after taxes.

If the Company had distributed 66⅔% of its earnings after taxes during the postwar period its total liquid securities and cash funds on June 30, 1955 would have been about $120,000 after setting aside funds with which to pay current liabilities. Had the Company continued to distribute two-thirds of its earnings after taxes through June 30, 1956 its liquid securities and cash funds on that date would have been reduced to a point approximately $473,000 below its existing current liabilities and it would have had no cash funds for working capital purposes. Had the Company continued to make distributions at the same rate through June 30, 1957, its liquid securities and cash on hand on that date would have totalled about $824,000 after setting aside funds to meet current liabilities. This latter amount is less than the Company's actual cash disbursements for ten average business days during its fiscal year ended June 30, 1957.[5]

Because the overall volume of the Company's business was constantly increasing during the postwar period, a large part of its earnings after taxes during this period were invested by the Company in additional inventories and accounts receivable and additions to its factory and equipment (or such earnings were balanced by increased liabilities). Accordingly, a large part of the Company's retained earnings were not available for distribution as dividends, regardless of the desires of the Company's management or its shareholders. If the Company's management had made dividend distributions equal to 66⅔% of its earnings after taxes during the postwar period, it would have produced a ruinous situation.

5. Assuming a week of five business days, the Company's average daily cash disbursements were $72,000 per day in its fiscal year ended June 30, 1955; were $88,000 per day in its fiscal year ended June 30, 1956; and were $90,000 per day in its fiscal year ended June 30, 1957.

## WORKING CAPITAL

### General Principles

The Company needs working capital to conduct its current business operations—particularly the purchase of raw materials and component parts, the payment of factory labor and expense, the payment of administrative expenses, the extension of credit to customers, the maintenance of stocks of finished goods in Muskegon and in its branch warehouses throughout the country, the operation of its system of branch sales offices and the costs of its catalogue advertising and national magazine advertising. The term "working capital" is employed here in the sense in which it is customarily employed in the business community. That is, it is a net amount composed of all those assets customarily classified as "current",[6] less all liabilities due and payable within twelve months. There is attached to this statement as Appendix II a summary of the Company's working capital at the close of each of its fiscal years during the postwar period. There is also attached to this statement as Appendix I a summary of the changes in the Company's working capital during the postwar period.

The Company's need for working capital has always been divided by its management into three specific needs:

Anticipated requirements for extending credit to customers.

Anticipated requirements for carrying inventories.

Anticipated cash expenditures for labor costs and for other items of expense, particularly those involved in meeting the fixed charges of its system of branch sales offices.

In predicting these needs during the postwar period, the Company's management has taken into account a series of factors which affect specific aspects of the Company's business operations. These are:

The temporary fluctuations anticipated during a fiscal year in the volume of its inventories and receivables.

The Company's business cycle.

The anticipated volume of the Company's business.

The Company's management has always planned working capital levels at the end of each fiscal year to meet its needs during the forthcoming fiscal year. At the end of each year it has reviewed its previous experience and has predicted its needs during the forthcoming fiscal year on the basis of this experience viewed in the light of current business conditions. In planning working capital levels the Company's management has acted on the principle that it is irrelevant whether working capital is adequate to meet the business needs of the fiscal year which is coming to a close, but vital to have on hand working capital for the fiscal period about to begin. Since 1938, when it retired its last loan from a bank, it has been the policy of the Company's management to avoid borrowing to meet working capital needs. Accordingly, it is the policy of the Company's management to retain at the close of each fiscal year working capital sufficient to meet the needs of the fiscal period for which it is planning.

Throughout the post war period the Company's management planned working capital, as it planned all the Company's policies and operations, with the objective of continuing the expansion of its business. It therefore planned in the expectation of constantly increasing levels of sales and profits. At the same time, the Company's management recognized that it could not realistically expect uniformly favorable business conditions. It was the policy of the Company's man-

---

6. That is, cash and its equivalent (for example Treasury securities and interest accrued on Treasury securities) inventories of materials and parts, inventories of goods in process, inventories of man- ufactured goods and prepayments. See American Institute of Accountants, Accounting Research Bulletin No. 43 (1953).

agement during the postwar period to set working capital levels high enough to permit the Company to meet temporary adverse conditions which it could anticipate from its past experience.

### Actual Determination of Working Capital Levels

The general principles described above have been employed by the management of the Company to analyze the working capital of its business during the postwar period. The principal aspects of the analysis which it employs are stated below.

1. *Temporary Business Fluctuations.* The Company's business is not seasonal in the usual sense. It varies according to general economic conditions rather than with the calendar. Some of the Company's factory costs fluctuate. However, because of its heavy fixed charges, particularly those in its branch sales offices throughout the country, the combined total of the Company's labor and other expenses tends to be relatively constant within any fiscal period. Fluctuations in business activity within a fiscal period are, therefore, reflected principally in the Company's monthly inventory balances and accounts receivable balances.

Accordingly, the Company's management establishes a working capital level to meet anticipated fluctuations in its business during the coming fiscal year by providing for accounts receivable and inventories so as to reflect the fluctuations in these items.[7] It makes no provision for fluctuations in labor and other expenses within a fiscal period.

In order to provide an adequate factor for inventory and accounts receivable fluctuations, the Company's management has analyzed the experience of past fiscal years by reference to each year's highest month-end balances in accounts receivable and each year's highest month-end balances in its total inventories rather than analyzing its experience by reference to average balances or minimum balances during particular fiscal periods.[8] The Company's monthly balances of inventories and receivables, the annual averages and the highest month-end balances in each year have been set out in Appendix J for the seven fiscal years of the Company ended June 30, 1957.

2. *Business Cycle.* Because of the complexity of the Company's buying, manufacturing, storing, selling, branch warehousing and shipping operations, the length of its business cycle is not subject to precise control. Moreover, the factors which affect the length of the Company's business cycle are so varied in their nature and so numerous that it is difficult to predict its length accurately. The Company's business cycle calculated for each of the seven years ended June 30, 1957 is set out in Appendix K. Between the year ended June 30, 1953 and that ended June 30, 1957, the length of this business cycle increased from 124 to 152 days, an increase of 28 days or more than 22%.

During the postwar period the Company's management planned working capital with the knowledge that both portions of its business cycle—the inventory cycle and the receivables cycle—were variable, that the factors producing variations in them were only in part subject to control and that an extension of either part of the Company's business cycle for any reason absorbed cash in substantial amounts.

a. *The accounts receivable cycle.* During the postwar period the Compa-

---

7. The fluctuations referred to under this head are those which occur within a particular period as the result of a temporary level of business activity higher or lower than the general or average level for the year. Changes in the general level of the Company's business from one year to the next, or over a series of years, are quite separate. These longer term changes in the general level of the Company's business are dealt with in the portion of this statement entitled "Volume of Business".

8. It should be noted that the use of a total inventory balance for this purpose produces a much smaller peak than would be produced if inventory accounts were analyzed separately and a total taken of the month-end peaks within each such account.

ny's accounts receivable from customers have been collected in an average of 35 to 40 days. See Appendix K. The Company has experienced a collection cycle of as much as 105 days on sales through its branches and 116 days on sales to dealers. An analysis of the collection periods experienced by the Company during the depression of the early 1930's, during the prosperous period 1939 through 1941 and during typical postwar periods is set out in Appendix O.

During the years in question, the Company's management believed, on the basis of its experience during the prosperous period 1939 through 1941,[9] that it might at any time experience a condition similar to that which occurred during this earlier period when the collections cycle extended to between 50 and 60 days while sales remained at a high level. Such an extension of the collections portion of the Company's business cycle would have slowed down the incoming flow of cash realized through collections from customers at the same time as the outgoing flow of cash required to support high sales levels remained approximately the same. Analyzing this situation in the light of the Company's experience, the Company's management believed during the period 1954 through 1957 that a slowing down of the accounts receivable portion of its business cycle might reduce its cash balances sharply within 60 to 90 days after collections began to extend.[10]

b. *The inventory cycle.* The major portion of the Company's overall business cycle computed in Appendix K is the part which is referred to in that appendix as the "inventory cycle". That term refers to the time required for material received by the Company to be manufactured, moved into the inventory of finished goods, sold and then moved out of inventory by shipment to a customer.

The time span computed in Appendix K sums up a number of processes which are physically distinct from each other and which, in their actual operation, are exceedingly complicated because:

(i) The Company's products themselves are so numerous and so diverse.

(ii) The Company's manufacturing processes for its metal products are entirely different from those for its paper products.

(iii) There are substantial differences between the rates at which various classes of the Company's products, and various items within the same class, turn over.

As a matter of necessity the Company's management deals separately with the operations which are summed up in this statement by the term "inventory cycle". Purchase orders, manufacturing schedules, factory labor schedules, shipping schedules, inventories at its headquarters in Muskegon, inventories in its various branch locations and so forth are planned as such and are planned separately for various items or classes of items.

When planning working capital during the postwar period, the Company's management has taken into account the time span which it anticipated between its receipt of materials and the receipt of those materials by its customers in the form of finished goods, that is, by taking into account the length of its inventory cycle. The effects which changes in its inventory cycle have on the Company's working capital needs are and always have been analyzed by the Company's management in terms of particular operations (purchasing, manufacturing, shipping, etc.) and particular items (steel inventories, inventories of particular classes of finished goods, etc.).[11]

9. During those years the Company approached, although it did not reach, the peak prewar level of business which it had achieved in the business boom of the 1920's.

10. In June, 1955, the Company's management estimated that this reduction might amount to $700,000 during the forthcom-

ing year; in June 1956 that it might amount to $500,000 in the forthcoming year, and in June 1957 that it might amount to $1,000,000 in the forthcoming year.

11. All the statements in the paragraphs immediately below which deal with analy-

When planning the Company's working capital levels, its management has taken the anticipated length of its inventory cycle into account for two reasons:

(i) Every increase in the length of the inventory cycle absorbs cash by converting it into inventories which must be carried.

(ii) Every increase in the length of the inventory cycle absorbs cash by increasing the length of time between the point at which an outlay of cash is made for operating expenses which are not reflected in inventory costs (administrative salaries, sales salaries, etc.) and the point at which that outlay is recouped from the proceeds of a sale.

In accounting terms, the first effect described above simply converts one item of working capital (cash) into another (inventory) whereas the second effect decreases total working capital. However, from the point of view of the Company's management, the primary significance of both effects during the postwar period was their absorption of cash.

When evaluating the effect which an increase in its inventory cycle would have on the amount of inventory which the Company must carry, its management has been particularly concerned with the extent of its orders for materials placed with the Company's suppliers. Most of the Company's materials, including its steel (the Company's principal raw material), its paper stock, its shipping cartons, all of its paint, and almost all the hardware which it uses are manufactured to its specifications and, if they had to be sold in any form other than as part of a finished product, would bring not much more than their scrap value. Because its materials must be made to its own specifications, the Company places orders with its suppliers for considerable periods in advance. Its advance orders at the close of each quarter of each of the fiscal years in question are analyzed in Appendix N.

The Company's liabilities to suppliers on advance orders are not reflected in its books of account. However, they are in all cases firm contractual obligations. When the length of the Company's inventory cycle increases it must receive and pay for materials ordered in advance even though this increases its stock of raw materials and parts beyond the levels which it desires or plans to carry.

3. *Annual Volume of Business.* The annual volume of the Company's business is measured by its gross sales. During the postwar period, the Company's annual gross sales have increased substantially and rapidly. The increases in annual gross sales are shown in graphic form in Appendix F.

The Company's sales organization during the postwar period consisted of three divisions—its system of branch sales offices described above, its dealer sales organization (a group of field representatives working under Mr. Boyd, the Company's manager of dealer sales, and his staff in Muskegon) and its Kopi-Spot division (which operates out of the Company's various branch sales offices but which is organized as a separate division under Mr. Straus). The rate of increase in sales during the postwar period has not been uniform as between these major divisions. Sales and sales increases by major divisions are stated in tabular form in Appendix L. As Appendix L indicates, the total gross sales of all the Company's divisions have increased at a compound rate of about 7.5% per year. However, the Company's management has always acted on the conviction that sales projection by any statistical method is no more than a guide to making what is essentially a management judgment. Accordingly, the Company's management has actually projected sales levels for each forthcoming year during the postwar period by analyzing the experience of past years and then by appraising business conditions in the light of its judgment.

sis or consideration of the Company's inventory cycle are made with reference to this underlying fact. Solely for convenience, the term "inventory cycle" is employed in these paragraphs without qualification or repeated explanation.

The Company's management determined in June, 1955 that its working capital projections for the year ended June 30, 1956 should be based on an assumed gross sales level of $22,500,000. The Company's management determined in June, 1956 that its working capital projections for the year ended June 30, 1957 should be based on an assumed gross sales level of $24,000,000.

In June 1957, the Company's management reviewed the decline in its gross volume of sales which had begun some months before and had accelerated in May of that year and realized that for the office equipment industry in general and for the Company in particular, the recession of 1958 had begun. The Company's management was at that time unable to predict the level of sales during the recession period into which it had entered. However, it planned on the assumption that, shortly after the close of the recession, its volume of sales would rise to something more than $26,000,000 per year. Accordingly, the Company's working capital plans as of June 30, 1957 were based on this assumption.

If the Company's management had relied solely upon a statistically accurate method of projecting sales (uninfluenced by estimates of short-term business conditions) its working capital planning would have been based upon higher sales levels. The differences between the estimates employed by the Company's management and a statistically accurate projection uninfluenced by existing conditions at the turn of the year is set out below:

|  | Management Estimate for the Forthcoming Fiscal Year | Statistical Projection for the Forthcoming Fiscal Year [13] |
|---|---|---|
| June 1955 | $22,500,000 | $23,750,000 |
| June 1956 | 24,000,000 | 25,630,000 |
| June 1957 | 26,000,000 [12] | 26,875,000 |

4. *Summary.* At all times during the postwar period the management of the Company regarded the ultimate determination of working capital levels as a management decision which required analysis of the factors described above, but which rested, finally, upon an informed business judgment. On this basis, the Company's management determined in June, 1955 that the Company should have at the beginning of its fiscal year ended June 30, 1956, working capital of approximately $9,000,000. Simili[a]rly, it determined in June, 1956 that it should have, at the beginning of its fiscal year ended June 30, 1957, working capital of approximately $9,500,000. Similarly, it determined in June 1957 that it should have at the beginning of its fiscal

12. As stated previously, the management estimate of June, 1957 was not for the immediately forthcoming year but involved an element of delay due to the existence of a recession, a factor which does not enter a purely statistical projection.

13. The method favored by most statisticians for projecting relatively complex trends (such as sales) is known as the "least squares method." Croxton & Cowden, Applied General Statistics, 399 (8th ed. 1945). Projections of sales by this method are made by reference to the sales of prior years through a formula which has the net effect of assigning relatively less weight to the experience of a, past year as time goes on. The formula is described in detail in Croxton & Cowden, op. cit. supra, at 399.

Applying to the Company's experience in the postwar period this method of projecting sales statistically would have resulted in projecting, as of June 30, 1955, June 30, 1956 and June 30, 1957 the volume of sales for the forthcoming year set out above.

year ended June 30, 1958, working capital of approximately $10,000,000.

The minimum working capital needs thus determined by the Company's management varied only to a minor extent from those which would have been determined had the Company's management determined its working capital needs for a single business cycle of a forthcoming fiscal year by employing

(a) statistically accurate sales projections,

(b) computations of its business cycle based on past experience alone, and

(c) ratios between sales volumes and working capital needs based on the experience of past years alone,

and if it had set working capital levels in the light of these factors without reference to its appraisal of existing business conditions. The extent of the variation in each year is shown in Appendix M.

*The Effect of Federal Income Tax Payment Schedules Upon the Company's Working Capital*

In determining its working capital on hand at the close of a fiscal year the Company's management takes into account its accrued and unpaid liability for Federal income taxes. However, in determining working capital levels for the forthcoming fiscal year no provision is made for the Federal income taxes which will be allocable to that year.

The problem of reserves for taxes or a provision for taxes in its working capital became increasingly important during the years in question. During these years the provisions of the Internal Revenue Code of 1954 requiring the payment of a corporation's Federal income

taxes on declarations of estimated tax in advance of the close of a taxable year became effective. Sections 6016, 6074, 6154 IRC. The net effect on these provisions was to accelerate the date on which cash had to be applied by the Company to the payment of its taxes. The Company's advance payments of corporate income tax were $505,000 during the year which ended June 30, 1957, the last year in question. In the succeeding year they were more than $700,000.

The Company's management has considered whether it should establish working capital reserves out of which to make its tax prepayments or whether it should take into account when planning working capital for a forthcoming fiscal year the prepayments which will have to be made during that year rather than after its close. However, the Company's needs for current working capital and its other needs have not permitted its management to take either of these steps.

REPLACEMENT OF FIXED ASSETS

The or[i]ginal cost of the Company's fixed assets at its manufacturing headquarters (other than land), the depreciation allocable to them and the undepreciated balance of their original cost are set out in Appendix P. The Company has constantly expanded its manufacturing facilities but has replaced very few of its buildings[12] and relatively little of its equipment. Of the manufacturing and storage space in its plant buildings, more than 25% was over forty years old on June 30, 1957 and more than 75% was over 25 years old on June 30, 1957.

The composite original useful life of the Company's manufacturing facilities was approximately 25 years during the three taxable years in question here. There had expired during each of the three taxable years in question here ap-

12. Each of the factory buildings described in Appendix C is in existence today. Each of these was built for the purpose of expanding the Company's manufacturing operations, rather than as a replacement. Between them, the buildings described in Appendix C represent more than 75% of the factory space in the Company's manufacturing headquarters.

proximately 12 years of this composite original useful life.[13]

During its taxable years ended June 30, 1955, 1956 and 1957, the Company's management believed that major replacements of its plant and equipment would have to be anticipated within the period ending 1965. At the same time the increase in the volume of the Company's business made it imperative to devote construction funds to the erection of new buildings rather than the replacement of old buildings. Accordingly, Building No. 31, which was begun in 1955 and completed in 1956, was used to expand manufacturing and storage facilities rather than to replace existing manufacturing and storage facilities. While Building No. 31 was in the process of construction the Company's management:

(1) expected that the Company would have to build an adjoining building in the near future in order to expand manufacturing operations and provide additional storage space for contemplated increases in inventory, and

(2) determined that it could save money by putting down, at the same time as Building No. 31 was being constructed, the first column footings for this adjoining building.

In 1955 these footings were put in place, and in 1960 construction of this building (Building No. 33) was begun at a cost of $453,000, exclusive of the cost of the machinery and equipment which will be installed in it. Like Building No. 31, Building No. 33 will also be employed to expand manufacturing and storage facilities.

For many years, the Company has engaged engineers to appraise its plant and production equipment for the purpose of insuring it against loss. Since 1906 it has engaged the firm of Coats and Burchard for this purpose. This firm analyzed the reproduction cost of the Company's plant and equipment periodically in reports which have been brought up to date annually by additional surveys. Copies of the 1954 report and of the revisions made in May 1955, May 1956 and May 1957 are attached as Appendix Q. In addition there is included in Appendix Q for the purpose of illustration a copy of the supporting data on which the 1957 revision is based. The 1955 and 1956 revisions are based on similar data. There are, in support of the 1954 report, more than 850 pages of data in which each building and each item of equipment in the Company's manufacturing headquarters is separately analyzed. The bulk of this material makes it impractical to reproduce it in Appendix Q.

During the period between 1950 and 1960, many of the Company's major competitors have built completely new plants. Among these have been:

*Steelcase.* Built completely new plants in Grand Rapids, Michigan. Abandoned old plant in Grand Rapids.

*All Steel Equipment Co.* Built new plant in Aurora, Illinois.

*Art Metal Co.* Built new plant in Spartansburg, South Carolina and substantially refurbished plant in Avenel, New Jersey.

*General Fireproofing Company.* Built new plant in San Luis Obispo, California, and new office building in Youngstown, Ohio.

During the years in question the objective of the management of the Company was to continue producing goods from its existing plant and with its existing machinery and equipment without making major replacements for as long as it could do so at a profit. At the same time the management recognized that

| 13. As of June 30 | Original Composite Useful Life in Years | Expired Composite Useful Life in Years |
|---|---|---|
| 1955 | 25.98 | 12.90 |
| 1956 | 24.48 | 11.39 |
| 1957 | 25.36 | 12.24 |

the Company's plant and equipment would need major replacements before the end of 1965 in order to maintain the Company's competitive position. During the years in question, the Company's management assumed that the cost of the replacement program which it anticipated would be at the general level shown by the Coats and Burchard reports rather than at the general level represented by the prices which it had paid for its existing plant.

The reserves for depreciation established on a cost basis in the Company's books of account and reflected in its balance sheet and other financial statements are not funded reserves but are valuation reserves only. That is, the existence of these reserves does not indicate that cash or other property has been set aside in amounts equal to the balances in the reserves. Putting the same matter another way, the creation of the Company's depreciation reserves and their annual enlargement by depreciation charges did nothing more than record in a systematic fashion the fact that portions of the amounts originally expended for factories and equipment should be viewed as chargeable to the income of particular years of operation. The establishment of these reserves and the annual additions to them did nothing toward creating or providing or setting aside funds with which to replace the assets to which the reserves were allocable.

### THE TIMER

The development of the TIMER, the Company's newest product, is an outgrowth of the Company's long period of experience in the production and sale of accounting forms and accounting systems. The significance of the TIMER to the Company's overall business cannot be understood without reference to the development of its business in these respects.

The Company has manufactured and sold various forms and other paper supplies for use in machine accounting systems since before 1930. Many of these forms are standard forms used with nationally known machines such as National Cash or Burroughs machines and were developed for the Company by Mr. L. K. Straus. During World War II Mr. L. C. Walker and Mr. Leon Allyn developed a method of applying spot-carbon to forms such as checks and pay statements. This permitted the perfection of payroll and other accounting systems to be used with a device known as a multiple writing board. These forms and the device with which they are used are known, together, under the trade name Kopi-Spot. Kopi-Spot was developed as a means of handling economically the complex payroll procedures that originated from income tax withholding, social security taxation, wartime salary and wage controls, war contract renegotiations and savings bond and other withholding procedures. It was conceived of as a means of simplifying and reducing the cost of payroll accounting for employers who could not economically employ machine accounting systems.

During the postwar period, Kopi-Spot has been the most rapidly expanding portion of the Company's business. See Appendix R. By June 30, 1957, the Company estimated it was selling its Kopi-Spot products to more than 40,000 separate customers.

Kopi-Spot is unique among the Company's products in that it generates more frequent and more intimate contact between the Company's representatives and the employees of its customers than does any other branch of the Company's business. The effective employment of Kopi-Spot depends on frequent and continuing contact between the Company and its customers. The Kopi-Spot division employed, as of June 30, 1957, more than 60 salesmen and some 45 service representatives. The sole function of the latter was to inspect periodically the Company's Kopi-Spot installations and to consult with its customers concerning the employment of Kopi-Spot systems.

The Company's activities in developing and selling Kopi-Spot required extremely detailed studies of many payroll systems of potential customers. During the

late 1940's and as a result of this work, Mr. Straus came to the conclusion that the costliest aspect of payroll accounting, and that which produced the most frequent errors, was the computation of elapsed time used as the basis for computing wages payable. He observed that, although there were many time clocks available to industry and although many of these clocks incorporated printing devices to show the time at which a work operation was begun and the time at which it was ended, there were no devices by which to compute automatically the time elapsed from the beginning to the end of a work operation and to record that time in such a way as to form the basis for a payroll accounting operation.

Mr. Straus' observations led him to the conclusion that a machine which could perform these functions would be an extremely valuable commercial product if it could be sold at a price (or leased at an annual rental) which would justify its cost in terms of observable savings to the purchaser or lessee. In the late 1940's Mr. Straus began the development of a machine to accomplish these functions. That machine is now known as the TIMER. A detailed history of the development of the TIMER is set out in Appendix S.

By June 30, 1955, the management of the Company

(1) had concluded that its existing Kopi-Spot business was an ideal base from which to begin the marketing of the TIMER;

(2) had concluded that the TIMER was a logical extension of this business;

(3) had entered into negotiations with American Totalisator Company for the manufacture of TIMERS for The Shaw-Walker Company; and

(4) had concluded that, in order to be acceptable to the market, the TIMER would have to be leased rather than sold.

By June 30, 1957, the management of the Company had determined that it would begin the commercial exploitation of the TIMER as soon as production models were received and tested. At this time the Company's management did not have a firm marketing and manufacturing schedule for the TIMER. It had set only a general goal—to have TIMERS manufactured on a mass production basis and distributed in volume as soon as possible after the production models of the machine had been proved serviceable and the machine had proved acceptable to its customers. During 1957, the Company's management planned on supplying tooling to American Totalisator Company for the initial production of the TIMER which would be capable of producing 10,000 machines. The specification of such tooling was begun in March 1958, and the tools themselves were ordered in November 1958.

By June, 1957 the Company's management believed that it could and should secure TIMERS from American Totalisator at a price of about $400 each.[14] The Company's management was at this time planning on the assumption that it would set TIMER rental sales so that the total rentals realized over the anticipated useful life of a TIMER would return to it

The unit machine price
paid to American Totalisator ...$400
Advertising, selling and
distribution costs .............$400
Gross profit ..................$200

and that rentals would be on a schedule which would return costs and gross profit over a five-year lease period.

In the plans for the TIMER which it had formed by June, 1957 the management contemplated that it would establish card printing facilities to produce cards for the TIMER as soon as the number of TIMERS in the hands of customers permitted the production of these cards in a volume sufficient to earn a profit on the card production operation itself.

14. The Company's first production run of machines was actually purchased at $800 each.

The management anticipated that $1,-000,000 would be required to establish these facilities and to carry the inventories and receivables generated by the production and sale of TIMER cards.

## EXECUTIVE STOCK

The Company's Executive Stock is a common stock first issued as "Industrial Stock" in 1916 and denominated as Executive Stock under a resolution of the Company's Board of Directors of July 23, 1928. This stock is issued only to key employees of the Company. It is the same as the Company's common stock in all respects except that its transfer is limited and its redemption price is stated pursuant to agreements between the Company and the holders of the stock, pursuant to provisions in the amendments to the Company's certificate of incorporation which authorize the issuance of the stock and pursuant to provis[i]ons of the Executive Stock certificates themselves. There is set out below a comparison between the Executive Stock and regular common stock outstanding on various dates.

|  | June 30, 1955 | June 30, 1956 | June 30, 1957 |
|---|---|---|---|
| Regular common stock | 108,197 | 108,197 | 108,197 |
| Executive stock | 14,026 | 13,548 | 14,098 |

Between 1954 and 1958 five holders of Executive Stock had small holdings of regular common stock. During the years in question, these shareholders never held as much as 8% of the combined total of Executive Stock and regular common stock on any date.

Executive Stock has always been sold by the Company at a fixed price per share. It is repurchased by the Company at the price per share paid for it plus any increases in book value per share which have occurred between the date the share in question was sold and the date it was repurchased. Since 1916, when it was first issued, the executives of the Company have understood that it has been the intention of the Company to repurchase Executive Stock from the executives to whom it was issued within 90 days of their retirement or from their widows or heirs, and to do so, in the latter case, at the request of these widows or heirs. There is a further understanding between the Company and all widows now holding Executive Stock that the Company will purchase, at the time of their death, all Executive Stock which they now hold. The management of the Company has, at all times since the original issue of this stock, acted on the conviction that the Company is under a moral obligation to make such repurchases. In purchasing Executive Stock the executives of the Company have viewed the arrangements with respect to such stock as constituting a plan in the nature of a retirement plan pursuant to which the Company is morally obligated to make repurchases on the terms described above. The Company's executives have relied upon the existence of this moral obligation in making purchases of this stock, and they continued to do so during the years in question.

There is attached to this statement as Appendix T a summary of the actual repurchases of Executive Stock made by the Company from June 30, 1954 through June 30, 1960. During the years in question, the Company's books of account included an account in the nature of a segregation of surplus which, as of the close of each year, was equal to

(i) the total formula price [15] at which all shares of Executive Stock

15. The term "formula price" refers to the price at which shares of Executive Stock could be repurchased as of any particular time pursuant to the terms for repurchase described above.

outstanding could then be repurchased, less

(ii) the price which would have been received by the Company for those shares if they had been repurchased in full by the Company and immediately resold at the fixed price per share then being paid for Executive Stock.

During this period, the Company's books of account also included a memorandum entry showing each year the gross amount which would then be required by the Company to repurchase at the formula price those shares of Executive Stock which were then in the hands of the widows or heirs of former executives of the Company rather than in the hands of executives themselves. The purpose of this latter entry was simply to identify for planning purposes the amounts which the Company could anticipate being required to disburse for shares of Executive Stock in the near future. The amount of this entry at the close of the years in question was

| June 30 | Amount |
|---------|--------|
| 1955 | $600,000 |
| 1956 | $665,000 |
| 1957 | $760,000 |

Neither of the entries described above reflected the existence of a separate fund of any kind.

### BANK SALES

Early in 1954 the management of the Company concluded, from its analysis of the market for office equipment, that the large building and remodeling programs being undertaken by banks in all parts of the country made banks one of its potentially most profitable sources of business. During 1954, the Company began actively to increase its solicitation of bank business, and to expand its line of special purpose bank equipment. This equipment is described in the Company's separate bank equipment catalogue issued in 1955, a copy of which is attached as Appendix U.

As a result of an extensive program of interviews with bank officers and bank purchasing departments, the Company's management concluded early in 1954 that it could not expect to make sales to any of the larger banks in which it did not maintain an account of the size considered significant by the officers of that bank. Accordingly, during its fiscal year ended June 30, 1954 the Company undertook a program of converting interest-bearing Treasury securities and deposits in its disbursing bank, the Hackley Union National Bank in Muskegon, into deposits in the larger banks in major cities which were potential customers. Deposit accounts were opened [16] only after discussions between Mr. L. C. Walker, Mr. Harrington, the Company's Treasurer, or Mr. Hedeman, the Company's Branch Sales Manager on one hand and an official of the depositary bank on the other hand concerning:

(1) The present or anticipated demand of the depositary bank for products manufactured and sold by the Company, and

(2) the policy of the bank with respect to favoring depositors when placing orders for office equipment.

As a result of this program of managing its funds, the Company's sales to depositary banks increased substantially in the fiscal year ended June 30, 1954. There is attached to this statement, as Appendix V, a summary of the Company's deposits in customer banks between July 1, 1953 and June 30, 1957. There is also attached, as Appendix W, a summary of the Company's sales to its depositary banks.

16. The Company has always maintained at least one bank account for receiving funds in each of the cities in which it has a branch, as well as an account in its disbursing bank, The Hackley Union National Bank, in Muskegon. Its relationships with its depository banks have always produced some business. During the development of the Company's bank sales program beginning in 1954, its deposits in these banks were adjusted on the basis of discussions with the officers of these banks similar to the discussions with the officers of banks in which new accounts were located.

None of the Company's earnings and profits have been retained for the sole purpose of employing them in its bank sales program. The Company has employed in this program funds retained for other purposes, and has viewed its bank sales program as a means of increasing operating profits through the use of assets which would, if not employed in the bank sales program, be earning only the return earned by short-term Treasury securities.

Because of its heavy fixed charges, the Company cannot operate profitably on a small volume of business. Conversely, on a differential profit analysis,[17] the Company's profit per dollar of sales is higher on the last dollar of sales during any fiscal year than it is on the first. Accordingly, the overall objective of the Company's management has always been to sell the largest possible volume of its products.

During the years in question, the Company could not have made any substantial part of the sales to banks set out in Appendix W if it had not maintained the deposits set out in Appendix V. Accordingly the Company's deposits set out in Appendix V permitted it to earn on the sales set out in Appendix W a differential profit substantially higher than its average profits for these years. Therefore liquid assets retained by the Company during the years in question as working capital for the TIMER program, for the replacement of fixed assets, and for the repurchase of Executive Stock but employed in its bank sales program pending their use for these purposes produced substantial operating profits.

### CONCLUSION

During the taxable years ended June 30, 1955, June 30, 1956 and June 30, 1957, the management of the Company believed, for the reasons stated above, that the earnings and profits retained by the Company were necessary to the operation of the Company's business.

THE SHAW-WALKER COMPANY
By /s/ GUY M. HARRINGTON
Guy M. Harrington
Executive Vice President
(Corporate Seal)
Attest:
/S/ LAURENCE A. WILEY
Laurence A. Wiley
Assistant Secretary
(Verified by Guy M. Harrington on September 12, 1960.)

———◆———

17. The term "differential profit" is employed here in the sense in which it is employed in cost accounting procedures. Neuner *Cost Accounting* 719 (4th Ed. 1952).